**PAPA JOHN'S INTERNATIONAL, INC. and RWT, Inc., d/b/a Papa John's Pizza, Appellants**

v.

**Gary McCOY, Appellee.**

**No. 2005–SC–000614–DG.**

Supreme Court of Kentucky.

Jan. 24, 2008.

---

8. *Id.*

9. *Id.* at 417.

10. *Id.*

Janet P. Jakubowicz, Brent R. Baughman, Jesse Allen Mudd, Greenebaum Doll & McDonald, PLLC, Louisville, KY, Counsel for Appellant Papa John's International, Inc.

Pamela T. May, Erich E. Blackburn, Pam May Law Firm, P.S.C., Pikeville, KY, Counsel for Appellant RWT, Inc., d/b/a Papa John's Pizza.

C. Thomas Hectus, Randall S. Strause, Hectus & Strause, PLLC, Louisville, KY, Counsel for Appellee.

J. Kent Wicker, Reed Wicker, PLLC, Louisville, KY, David J. Kaufmann, Daniel Gildin, Kevin M. Shelley, Kaufmann, Feiner, Yamin, Gildin & Robbins, LLP, New York, NY, Counsel for Amicus Curiae International Franchise Association.

Barbara B. Edelman, Alexander J. Moeser, Dinsmore & Shohl, LLP, Lexington, KY, Counsel for Amicus Curiae Kentucky Chamber of Commerce.

Opinion of the Court by Justice MINTON.

## I. INTRODUCTION.

This is a case involving the issue of franchisor vicarious liability, an issue of first impression in Kentucky. It arises in the context of a malicious prosecution and defamation lawsuit filed by a customer as a result of a Papa John's pizza delivery gone wrong.

The customer originally sued the delivery driver and Papa John's International, Inc., alleging that Papa John's was vicariously liable as the driver's employer. The driver's employer, however, was RWT, Inc., a Papa John's franchisee. Consequently, the customer filed another lawsuit against RWT; and the circuit court consolidated the cases. The circuit court granted summary judgment in favor of RWT and Papa John's for various reasons, which we will discuss in the following sections of this opinion. The Court of Appeals, however, affirmed in part and reversed in part as to both RWT and Papa John's, concluding that genuine issues of material fact precluded summary judgment.

As is well-settled in our case law, the driver's employer, RWT, is subject to vicarious liability for a tort committed by its employee acting within the scope of employment. We conclude that the acts complained of here occurred within an independent course of conduct that could not have been intended by the driver to serve any purpose of the employer. So, although for different reasons that we will discuss below, we conclude that the circuit court properly granted summary judgment dismissing the malicious prosecution claim against RWT. Accordingly, we reverse the Court of Appeals as to RWT.

The circuit court and the Court of Appeals addressed the vicarious liability of Papa John's using a mixed bag of respondeat superior and ostensible agency principles. Upon review, we conclude that we must take a more precise approach given the ubiquity of the franchise method of doing business in Kentucky. To that end, we adopt a rule in which the franchisor is vicariously liable for the tortious conduct of the franchisee when it, in fact, has control or right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm. Papa John's had no control over the pizza delivery driver's intentional, tortious conduct in this case. So Papa John's cannot be held vicariously liable. Although for different reasons that we will discuss below, we conclude that the circuit court properly granted summary judgment dismissing the malicious prosecution and defamation claims against Papa John's. Accordingly, we reverse the Court of Appeals as to Papa John's.

## II. FACTS AND PROCEDURAL HISTORY IN THE CIRCUIT COURT.

Gary McCoy is a resident of Prestonsburg, Kentucky. He owns two businesses, a scrap metal recycling company and a mining equipment leasing company. On the evening of February 18, 2000, he was working late at the scrap metal business. While he was working, his wife called him about dinner and told him that she would like to have Papa John's pizza, which they had never tried. His wife asked him to order one pizza for them for delivery to their home and another pizza for their housekeeper for delivery to her home. He ordered the pizzas from a Papa John's store, taking some time to inquire about how the store placed the pepperoni on the pizza, and set up the two deliveries. And he asked if the delivery driver could stop off at his business for payment because his wife did not have any money with her. The store stated that it could comply with his various requests.

The delivery driver that night was Wendell Burke. Burke delivered the two pizzas and then stopped at McCoy's business for payment. Burke and McCoy tell two stories of what occurred next, although their versions are not entirely different.

According to McCoy, after McCoy paid him, Burke remained at McCoy's business in McCoy's office and inquired about em-

ployment. McCoy was preoccupied with other matters, and it became obvious to him that Burke had no intention of leaving. So McCoy placed a hunting video in his VCR and told Burke to watch it. McCoy admitted that he had a beer can on his desk while Burke was in his office and a rifle in one corner of his office. The tape lasted about fifteen minutes. When the tape concluded, Burke left. After Burke left, McCoy received a call from the Papa John's store during which they inquired as to Burke's whereabouts.

According to Burke, when he arrived at McCoy's business, McCoy asked him to come in, which Burke did. McCoy took Burke back to his office where he paid him for the two pizzas. McCoy asked Burke to sit and talk awhile. McCoy expressed to Burke that he had been having suicidal and homicidal thoughts and had visions. While talking to him, Burke alleges that McCoy was drinking liquor and chasing it with beer. And at one point when Burke attempted to leave, McCoy stood up, picked up a rifle, showed it to Burke, and then laid it on his desk. While Burke was there, McCoy took several phone calls. After hanging up from one of the phone calls, McCoy informed Burke that that call had been from the Papa John's store; and they were inquiring as to Burke's whereabouts. Eventually, the subject of deer hunting came up; and McCoy asked Burke to watch a videotape of one of his deer hunting trips with him. When the tape ended, McCoy got up to take the tape out; and Burke slipped out. He returned to Papa John's about an hour and a half to two hours after he first left the store to deliver the pizzas.

Upon hearing Burke's version of the story and observing that Burke was quite upset, another employee of the Papa John's store felt that he should tell the police what had occurred and contacted them for him. Two officers responded to the call and took Burke's statement. The officers also took statements from two female employees who had spoken by telephone with McCoy that evening to take the pizza order. One employee described McCoy on the telephone as "extremely rude" and either "disoriented or highly irritated." The other described him as "difficult." A few hours later, the officers obtained a warrant and arrested McCoy at his home on the charge of unlawful imprisonment in the first degree. The local newspaper ran a story about the arrest a few days later.

A little over two months after the arrest, the district court, on McCoy's motion and with no opposition by the county attorney, dismissed the charge against McCoy. Although the record of the proceedings indicates that the county attorney agreed to the dismissal only with the stipulation of probable cause, McCoy was later successful—over two years later and in the midst of this civil lawsuit when confronted with a motion for summary judgment on the malicious prosecution claim on the ground that he could not establish that the criminal proceedings terminated in his favor—in having the final judgment set aside and an amended final judgment entered. The amended final judgment reflected that the district court dismissed the charges against Gary McCoy with prejudice and with no stipulations.

The Papa John's store where Burke worked on the night of the McCoy delivery was a Papa John's franchise that was owned and operated by RWT. Unaware that the store was not company-owned, McCoy filed an action on February 16, 2001, against Papa John's and Wendell Burke in which he alleged (1) wrongful arrest, (2) malicious prosecution, and (3) defamation. In its answer to McCoy's complaint, Papa John's represented that it

was the franchisor of the Papa John's store and that RWT was the owner/operator.

McCoy, in response to Papa John's representation, filed a separate complaint against RWT on March 29, 2001, alleging (1) wrongful arrest, (2) malicious prosecution, (3) defamation, and (4) outrageous conduct. The circuit court consolidated the two civil actions.

On motions for summary judgment filed by Papa John's, RWT, and Burke, the trial court dismissed the false arrest claims against all three defendants because there was no question that the officers arrested McCoy according to a valid warrant. As to Papa John's and RWT's claim that Burke was not acting within the course and scope of his employment when he gave a statement to the officers, the circuit court found as a matter of law that Burke was acting within the course and scope of his employment. Consequently for RWT, the circuit court concluded that it would be responsible under the doctrine of respondeat superior if the jury found Burke liable. But the trial court reserved ruling on summary judgment on the specific claims of malicious prosecution, defamation, and outrageous conduct.

RWT and Papa John's filed a joint motion to alter, amend, or vacate the circuit court's conclusion that Burke was acting within the course and scope of his employment. In the motion, they also renewed their previous motion for summary judgment. The trial court granted summary judgment to RWT and Papa John's on all of McCoy's claims against these two defendants. But the trial court did not dismiss the proceedings against Burke.

The circuit court's supporting conclusions with respect to RWT were as follows: (1) as to the defamation claim, it was barred by the one-year statute of limitations under Kentucky Revised Statutes (KRS) 413.140; (2) likewise, as to the malicious prosecution claim, it was barred by the one-year statute of limitations under KRS 413.140; and (3) as to the outrageous conduct claim, it failed because it is a mechanism for providing redress for extreme emotional distress—a so-called gap filler—when other torts do not, but had McCoy timely filed his defamation and malicious prosecution claims, they would have provided for McCoy's emotional distress.

The circuit court's supporting conclusions with respect to Papa John's were as follows: (1) because Burke was not an employee of Papa John's, Papa John's could be vicariously liable only under a theory of ostensible agency; (2) but McCoy did not rely on any representation made by Papa John's relating to Burke's acts, and his acts did not advance any interest of Papa John's; (3) so both the malicious prosecution and defamation claims failed as a matter of law.

### III. *THE OPINION OF THE COURT OF APPEALS.*

McCoy appealed, and RWT cross-appealed on the scope of employment question. Beginning with RWT, the Court of Appeals concluded that McCoy's malicious prosecution claim against RWT was not barred by the one-year statute of limitations since the criminal charge was not dismissed until April 10, 2000; and he filed his complaint on March 29, 2001. The defamation claim, however, was time-barred. And the Court of Appeals agreed with the circuit court that McCoy could not maintain the outrageous conduct claim (also called tort of outrage or intentional infliction of emotional distress) because Burke's conduct amounted to the commission of traditional torts for which recovery of emotional distress was allowed. On the scope of employment cross-appeal, the Court of Appeals held that it could not be

presumed that Burke intentionally lied and that a jury should decide whether he acted within the scope of his employment.

Moving to Papa John's, the Court of Appeals concluded that there were genuine issues of material fact under an ostensible agency theory that (1) Papa John's made representations—by allowing its trade name to be listed in the telephone directory, placed on the pizza boxes, placed on the local pizzeria, placed on the delivery person's uniform, and placed on the delivery person's car—that RWT and, consequently, its employees, including Burke, were its agents, and (2) that McCoy justifiably relied on that representation to his detriment. So the Court of Appeals reversed the summary judgment in favor of Papa John's on the claims of defamation (which did not have a statute of limitations issue as to Papa John's) and malicious prosecution.

As a result of the Court of Appeals' opinion, the following claims remain: (1) malicious prosecution against Papa John's, (2) defamation against Papa John's, and (3) malicious prosecution against RWT. We granted discretionary review on motion of RWT and Papa John's. McCoy did not file a cross-motion for discretionary review.

## IV. RESOLUTION AND DISCUSSION OF THE ISSUES.

A. *The Malicious Prosecution Claim Against RWT Fails as a Matter of Law Because There is No Genuine Issue of Material Fact that Burke's Act in Making an Allegedly False Statement to the Offi-* cers Occurred Within an Independent Course of Conduct that Could Not Have Been Intended by Burke to Serve Any Purpose of the Employer.

We begin our discussion with the malicious prosecution claim against RWT. We accept McCoy's allegations as true for the purpose of this review. The circuit court dismissed McCoy's claims against RWT on its motion for summary judgment. This Court will not revisit the summary judgment standard of review in this opinion because it is well-settled in our case law, other than to emphasize that summary judgment should only be used "to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant."[1] "It is only proper where the movant shows that the adverse party could not prevail under any circumstances."[2] We will affirm the grant of summary judgment when "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3]

McCoy sued RWT, Burke's employer, under a vicarious liability/respondeat superior theory. Under the doctrine of respondeat superior, RWT can be held vicariously liable for Burke's actions if he committed the tortious acts in the scope of his employment.[4]

---

1. *Roberson v. Lampton,* 516 S.W.2d 838, 840 (Ky.App.1974) (*quoted in Paintsville Hosp. Co. v. Rose,* 683 S.W.2d 255, 256 (Ky.1985)).

2. *Paintsville Hosp. Co.,* 683 S.W.2d at 256 (*affirmed as proper standard of review in Kentucky courts in Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 483 (Ky.1991)).

3. Kentucky Rules of Civil Procedure (CR) Rule 56.03.

4. *Patterson v. Blair,* 172 S.W.3d 361, 364 (Ky. 2005) (undertaking historical review of rationale for respondeat superior liability, considering economic structure and analysis); *Osborne v. Payne,* 31 S.W.3d 911, 915 (Ky.2000).

As the procedural history of this case illustrates, the concept of scope of employment is complex. And it is even more complex when the alleged tort in question is intentional, as is malicious prosecution, as opposed to the result of employee negligence.[5] In the area of intentional torts, however, the focus is consistently on the purpose or motive of the employee in determining whether he or she was acting within the scope of employment.[6]

For example, our predecessor court has held that an employee bus driver did not act within his scope of employment when he stopped the employer's bus in the middle of the street, left the bus, and assaulted another driver in a fit of road rage.[7] In that case, the employee's motive was to settle a personal controversy; there being no issue of fact, the case stood dismissed for failure to state a cause of action.[8] But an employee store clerk acted within the scope of his employment when he shot and killed a person in a grocery store during what he believed was a robbery.[9] In that case, the employee's purpose was to protect the premises; scope of employment was not a jury question.[10] And this Court has held that an automobile dealership employee acted within the scope of his employment when he sought to repossess a vehicle by intercepting a person at a stoplight, demanding that he get out of the car, and shooting the tires out on the vehicle when the person refused to get out.[11] In

that case, the trial court was correct in allowing the jury to impute liability to the employer for the employee's actions because he was acting at all times within the scope of his employment.[12]

In this Court's most recent case addressing the scope of employment issue, in a unanimous opinion,[13] we considered with approval the Tentative Draft of the Third Restatement of Agency, which rejected scope of employment formulations based on assessments of foreseeability,[14] instead focusing on the employee's purpose. Since the *Patterson* opinion, the American Law Institute has written the Restatement (Third) of Agency § 7.07 (2006), entitled "Employee Acting Within Scope of Employment." It is as follows:

(1) An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.

(2) An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

(3) For purposes of this section,

(a) an employee is an agent whose principal controls or has the right to control the manner and means

---

5. *Patterson,* 172 S.W.3d at 366.

6. *Id.* at 369 (reviewing and synthesizing *Wood v. Southeastern Greyhound Lines,* 302 Ky. 110, 194 S.W.2d 81, 82 (1946); *Frederick v. Collins,* 378 S.W.2d 617, 619 (Ky.1964); and *Osborne,* 31 S.W.3d at 915).

7. *Wood,* 194 S.W.2d at 83.

8. *Id.* at 83–84.

9. *Frederick,* 378 S.W.2d at 620.

10. *Id.*

11. *Patterson,* 172 S.W.3d at 363.

12. *Id.*

13. *Id.* at 372 (Graves, J., not sitting).

14. *Id.* at 369.

of the agent's performance of work, and

(b) the fact that work is performed gratuitously does not relieve a principal of liability.

This general rule is consistent with the standard advanced by Prosser and Keeton—as noted in the *Patterson* [15] opinion—in their treatise on tort law: "[I]n general, . . . the master is held liable for any intentional tort committed by the servant where its purpose, however misguided, is wholly or in part to further the master's business." [16] Thus, if the servant "acts from purely personal motives . . . which [are] in no way connected with the employer's interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable." [17] This approach "conforms to the economic theory of vicarious liability . . . because when the employee acts for solely personal reasons, the employer's ability to prevent the tort is limited." [18]

■■ Turning to the facts of this case, RWT's business was pizza and pizza delivery. Burke was supposed to deliver the two pizzas, collect payment, and return to the store to pick up more pizzas for delivery. Making a false statement to the police about a customer is no way connected to RWT's business. Indeed, there seems no more certain way to send customers to another pizza place than to accuse them falsely of imprisoning delivery drivers when they are delivering pizza. The motive alleged by McCoy is that Burke was trying to account for the inordinate amount of time that he loitered at McCoy's business. Another theory of McCoy's is

that Burke's purpose was to accuse McCoy falsely of committing a crime so that he could later sue him in a civil lawsuit and obtain a judgment against him, a man who owned two businesses. But under either theory, Burke's actions did not serve any purpose of RWT; the motives advanced for Burke's conduct are purely personal. His actions, as alleged, are totally independent of RWT's purpose of pizza delivery.

If, for whatever reason, Burke did not intentionally make a false statement to the officers—either he was simply confused about what had occurred or told the truth about what had occurred—then there is no tort; and no one is liable. But if he did lie, as discussed at length above, then he was acting outside the scope of his employment; and RWT is not subject to vicarious liability for a tort committed by its employee acting outside the scope of employment. Although our analysis differs from the trial court's, which granted summary judgment on statute of limitations grounds, we conclude, nonetheless, that there being no genuine issue of material fact, summary judgment in favor of RWT was appropriate.

■ McCoy argues that RWT is liable for Burke's conduct under two different theories: (1) he was acting within the scope of his employment at the time, which theory we rejected in the preceding discussion; and (2) RWT ratified the act. However, McCoy cannot demonstrate ratification in this case. So we reject this argument, as well.

In order to have ratified Burke's alleged malicious prosecution of McCoy, RWT had to have both (1) knowledge that Burke's

---

15. *Id.*

16. W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* 505 (5th ed. 1984).

17. *Id.* at 506.

18. *Patterson,* 172 S.W.3d at 369 (*citing* William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law,* 208–09 (1987)).

statement was false and (2) the intention to ratify it.[19] But McCoy can point to no facts that support his contention that RWT had knowledge that Burke's statement was false. The only two persons who know what happened that night between Burke and McCoy are Burke and McCoy. Burke has never renounced his allegation against McCoy. McCoy's malicious prosecution claim against Burke will not be resolved until a jury decides the case. And for that reason, McCoy's vicarious liability claim against RWT under a ratification theory fails as a matter of law.

McCoy contends that RWT cannot insulate itself from liability by claiming ignorance. In support, he cites the following general rule:

> However, under one view, where ignorance of the facts arises from the principal's own failure to investigate and the circumstances are such as to put a reasonable person upon inquiry, the principal may be held to have ratified despite lack of full knowledge. Thus, the general rule, that in order for ratification to bind the principal he or she must have been shown to have had full knowledge of the material facts relating to the unauthorized transaction, does not apply if the principal intentionally assumed the responsibility without inquiring, or deliberately ratified, having all the knowledge with respect to the act which he or she cared to have.[20]

But McCoy fails to cite the rest of the rule, which continues as follows: "Even then, however, for this exception to apply, the principal must have had actual knowledge of the facts relied upon to put him or her on inquiry."[21] McCoy points to no evidence that RWT had actual knowledge that night that Burke was fabricating his version of the events. Even McCoy did not testify in his deposition that he told RWT when he spoke to them that night—before Burke returned to the store—that Burke had loitered on his property for over thirty minutes and watched a hunting video. The evidence discussed by McCoy in his brief regarding RWT management having knowledge of prior incidents questioning Burke's credibility concerned information gained by law enforcement officers (and attributed by them to RWT) after the fact when Burke had already made his statement to the police officers.

B. *The Malicious Prosecution and Defamation Claims Against Papa John's Fail as a Matter of Law Because Papa John's had No Control Over Burke's Intentional, Tortious Conduct in this Case.*

As stated in the introduction to this opinion, the issue of franchisor vicarious liability is one of first impression in Kentucky. Both the trial court and the Court of Appeals utilized ostensible agency principles to resolve the issue, the trial court ruling that there was no liability, and the Court of Appeals concluding that there were genuine issues of material fact as to the existence of an agency relationship. Having reviewed the opinions of the courts below and case law from other jurisdictions, we believe that resolution of the issue requires a rule that focuses more precisely on the franchisor/franchisee arrangement.

■ Before we begin our discussion of the issue, we address McCoy's preserva-

---

19. *Edwards v. Kentucky Utilities Co.*, 289 Ky. 375, 158 S.W.2d 935, 936 (1942).

20. 3 Am.Jur.2d *Agency* § 185 (2007).

21. *Id.; see also* Restatement (Third) Of Agency § 4.06 (2006) ("A person is not bound by a ratification made without knowledge of material facts involved in the original act when the person was unaware of such lack of knowledge.").

tion argument and a premise raised by Papa John's concerning the amended judgment in the criminal proceedings. On the issue of preservation, McCoy argues that the issue of whether a franchisor such as Papa John's, which has no involvement in the day-to-day operations of its franchisees, may be held vicariously liable for intentional torts committed by franchisee employees is not preserved for our review. But this issue lies at the very core of McCoy's case. McCoy sued Papa John's under a theory of vicarious liability. And one of Papa John's defenses, as asserted in one of its memoranda in support of summary judgment, was that it had no liability, authority, participation, or responsibility with respect to the operations of the Papa John's stores that it did not own. Papa John's argued that McCoy could not present any evidence that Papa John's could be responsible under any scenario for the actions of RWT or its employees either through mandatory policies or any property interest. The issue is preserved.

█ Moving to a premise raised by Papa John's concerning the amended judgment in the criminal proceedings, Papa John's argues that the circuit court should have disregarded the amended judgment and given effect to McCoy's initial probable cause stipulation. The stipulation would have, of course, defeated McCoy's

malicious prosecution claim as to all parties.[22] The district court criminal proceedings, however, evade review. But they do not evade comment. Having reviewed the record, it is clear to us that McCoy's counsel was not forthcoming with the district court when he made his motion for an amended judgment to remove the probable cause stipulation. In no way should this case be construed as holding that such a practice will be countenanced in our courts if challenged properly. We turn to discuss the merits of Papa John's other arguments.

Because a franchisor typically concentrates its control on the quality and operational requirements relating to its trade or service mark, as opposed to the day-to-day operations and management of the business, "[t]he perceived fairness of requiring a principal who closely controls the physical conduct of an agent to answer for the harm caused by the agent is diminished in this context."[23] Taking the unique franchise arrangement into consideration, there is an emerging judicial consensus to apply a franchisor vicarious liability test that considers the franchisor's control or right of control over the instrumentality that is alleged to have caused the harm.[24]

The Supreme Court of Wisconsin recently considered the issue with which we are confronted in this case; in so doing, it

**22.** *See Broaddus v. Campbell,* 911 S.W.2d 281, 283–84 (Ky.App.1995) (holding that defendant's admission in open court that there was probable cause for issuance of an indictment against him barred him from later bringing malicious prosecution action against his accuser).

**23.** *Kerl v. Dennis Rasmussen, Inc.,* 273 Wis.2d 106, 682 N.W.2d 328, 338 (2004) (formulating a test to determine franchisor vicarious liability, which considers a franchisor's control or right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm).

**24.** *See id.* at 338–39 (discussing at length traditional master/servant test for vicarious liability and concluding that the principles and objectives are insufficient in the franchisor/franchisee context and identifying a clear trend in the case law in other jurisdictions); *Pizza K, Inc. v. Santagata,* 249 Ga.App. 36, 547 S.E.2d 405, 406–07 (2001) (held summary judgment in favor of franchisor proper in case involving negligence of franchisee's delivery driver when evidence demonstrated that franchisor did not have sufficient authority to control the time, manner, and method of executing the franchisee's work).

adopted and applied the test alluded to above.[25] In the *Kerl* case, an employee at an Arby's restaurant left work without permission. While away from work, he ambushed and shot his former girlfriend, seriously injuring her, and shot and killed her fiancé. He then turned the gun on himself. The estates of the two victims sued the franchisor of the Arby's system and the franchisee of the Arby's restaurant where the employee worked. The specific claim against Arby's was vicarious liability for the franchisee's negligent supervision of its employee. The lower court granted summary judgment in favor of Arby's, concluding that there was no basis for vicarious liability; and the Wisconsin Court of Appeals affirmed.

On review from the court of appeals, the Wisconsin Supreme Court concluded that "the 'control or right to control' test for determining the presence of a master/servant agency is not easily transferable to the franchise relationship." [26] After considering the fact that a franchise is a commercial arrangement between two businesses and the unique aspects of such an arrangement—franchisee authorized to use the franchisor's intellectual property and brand identity, marketing experience, and operational methods in exchange for a fee paid to the franchisor [27]—the *Kerl* court settled on an adaptation of the control or right to control test.[28]

In adapting the traditional test to suit the franchise business model, the court rejected the argument that standardized provisions commonly included in franchise agreements, which specify a right of inspection and such aspects as marketing, operational requirements, and uniform quality, "establish a franchisor's control or right to control the daily operations of the franchisee sufficient to give rise to vicarious liability for all purposes or as a general matter." [29] In rejecting that argument, the court held "that a franchisor may be held vicariously liable for the tortious conduct of its franchisee only if the franchisor has control or a right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm." [30]

Applying the rule, the court considered the claims against the franchisor—negligent supervision, hiring, and retention claims—and concluded that although the license agreement between Arby's and its franchisee imposed many quality and operational standards on the franchisee, the franchisor did not have the control or the right to control the franchisee's supervision of its employees.[31] Accordingly, it affirmed the grant of summary judgment in favor of the franchisor.

We adopt the rule established in the *Kerl* case for evaluating a franchisor's vicarious liability for the tortious conduct of its franchisee because we believe that it is well-reasoned and that it will lead to consistent results in our courts. Having reviewed the various turns that this case has taken regarding Papa John's, it is clear to us that the traditional rules pertaining to scope of employment and ostensible agency are inapposite to the issue of a franchisor's vicarious liability.

Guided by the rule, we turn to the evidence applicable to the franchisor's con-

---

**25.** *Kerl,* 682 N.W.2d at 340.

**26.** *Id.* at 337.

**27.** *Id.*

**28.** *Id.* at 340.

**29.** *Id.* at 341.

**30.** *Id.*

**31.** *Id.* at 342.

trol over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm, which, in this case, can only be characterized as the allegedly intentional, tortious conduct of RWT's employee, Burke. Since we have concluded above that Burke's act in making an allegedly false statement to the officers occurred within an independent course of conduct that could not have been intended by Burke to serve any purpose of the employer, there can be only one conclusion as to the vicarious liability of Papa John's: there is none. Here, Papa John's, the franchisor, had no control over the franchisee's employee's isolated and allegedly intentional, tortious conduct.

In concluding as we do, we do not intend to diminish the importance of this case to all parties, especially McCoy. However, the intentional nature of the claims dictates our analysis.

## V. CONCLUSION.

Under the doctrine of respondeat superior, an employer can be held vicariously liable for an employee's tortious actions if committed in the scope of his or her employment. In the area of intentional torts, the focus is consistently on the purpose or motive of the employee in determining whether he or she was acting within the scope of employment. Here, we conclude that the acts complained of occurred within an independent course of conduct that could not have been intended by the employee to serve any purpose of the employer. A franchisor is vicariously liable for the tortious conduct of the franchisee when it, in fact, has control or right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm. We conclude that Papa John's had no control over the employee's intentional, tortious conduct in this case. So Papa John's can-

not be held vicariously liable. We reverse the opinion of the Court of Appeals and reinstate the judgment of the trial court for RWT and Papa John's on all claims.

All sitting. ABRAMSON, CUNNINGHAM, NOBLE, and SCHRODER, JJ., concur.

SCOTT, J., concurs in part and dissents in part by separate opinion.

LAMBERT, C.J., dissents by separate opinion and joins SCOTT, J., as to dissent regarding RWT's liability.

Opinion by Justice SCOTT Concurring in Part and Dissenting in Part.

Although I agree that summary judgment was proper on Gary McCoy's claims against the franchisor, Papa John's International, Inc., the majority goes *too far* in insulating employers from liability for intentional torts committed by their employees. Thus, I write separately to address the malicious prosecution claim against RWT, Inc. In my view, summary judgment on that claim was improper because there is a genuine issue of material fact as to whether Wendell Burke, the delivery driver, was acting within the scope of his employment with RWT at the time of the reporting of the matter. Remember it was the false reporting of the incident that McCoy alleges caused the injury.

At the heart of this matter is the initiation by Burke of an allegedly false criminal charge against McCoy. This act was the basis for the malicious prosecution claim against RWT on a theory of vicarious liability. It is well-settled that RWT can be held vicariously liable if Burke committed the tort in the scope of his employment with RWT. *See Patterson v. Blair,* 172 S.W.3d 361, 366 (Ky.2005) (noting that an employer's liability is limited only to those employee actions committed in the scope of employment). "Scope of employ-

ment" is a flexible concept. Although this Court recently held in *Patterson* that the focus is on the employee's motive for his tortuous conduct, at various times it has been stressed that an employer can be vicariously liable for conduct of an employee that was (1) done in furtherance of the employer's business or at least partly motivated by an intention to serve the employer; (2) of the kind that the employee was employed to perform; (3) substantially within the authorized "time and space" limits of the employment; or (4) expectable in view of the employee's duties. *Booker v. GTE.net LLC*, 350 F.3d 515, 518–19 (6th Cir.2003) (applying Kentucky law).

As an initial matter, I note that RWT is not necessarily relieved of vicarious liability for malicious prosecution solely because it is an intentional tort. There are numerous decisions finding employers vicariously liable for the intentional torts of their employees. *See, e.g., Patterson*, 172 S.W.3d at 363 (holding that a car dealership could be held vicariously liable for the intentional tort of its employee, who shot out the tires of the plaintiff's truck during a repossession attempt); *Frederick v. Collins*, 378 S.W.2d 617 (Ky.1964) (holding a store vicariously liable for wrongful death when its employee shot and killed a customer); *Dennert v. Dee*, 308 Ky. 687, 215 S.W.2d 575 (1948) (holding the proprietors of a saloon vicariously liable for a bouncer's assault and battery of a patron); *Fournier v. Churchill Downs–Latonia*, 292 Ky. 215, 166 S.W.2d 38 (1942) (holding a racetrack vicariously liable when its security guard assaulted the plaintiff with a club); *J.J. Newberry Co. v. Judd*, 259 Ky. 309, 82 S.W.2d 359 (1935) (holding a store vicariously liable when its assistant manager falsely imprisoned the plaintiff). These cases correctly concluded that an employee's intentional tort can be within the scope of his employment. This occurs when the intentional conduct is closely related to the employment. *Booker*, 350 F.3d at 518.

In this matter, there is evidence that Burke was acting within the scope of his employment at the time the unlawful imprisonment charge, *which was based on events that allegedly occurred on the job*, was filed. After stating that he had been held captive against his will at McCoy's office, Burke told his coworkers that he did not want to call the police, nor press charges. Despite this, Burke's supervisors recommended that the police be called and actually made the call. RWT management even provided a written statement to the police. It was primarily those managers, not Burke, who wanted the charge brought against McCoy. *Burke only did so at the advice and direction of RWT, his employer.* These facts, which tend to show that RWT was not just a mere bystander to the tort, are sufficient to preclude summary judgment. *See Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky.1985) ("[Summary judgment] is only proper where the movant shows that the adverse party could not prevail under any circumstances.").

While I believe without a doubt that the scope of employment issue should be for the jury to decide, I do not mean to suggest that McCoy will necessarily prevail against RWT on his malicious prosecution claim. I do, however, believe that the present case should proceed on the merits, regardless of the anticipated outcome, because RWT entangled itself in the controversy between Burke and McCoy by making its reporting an employment-related matter. I therefore dissent.

Dissenting Opinion by Chief Justice LAMBERT.

I respectfully dissent from the majority opinion on the view that Appellant stated a

claim against the franchisor Papa John's for apparent or ostensible agency based on his reliance on its name, advertising, and the external indicia of responsibility such as signage and uniforms. The basis for a claim of apparent agency should not, as the majority suggests, depend on the degree of actual control exercised by the franchisor; rather, it arises from the reliance of the party dealing with the ostensible agent of the franchisor. In this case, Appellant specifically stated that he did not arbitrarily choose a restaurant to order from, but specifically decided to order from Papa John's.

The principle of ostensible agency, now in grave doubt, has long been recognized in Kentucky. In *Paintsville Hospital*,[1] we adopted the section of the Restatement (Second) of Agency, § 267 (1958), dealing with reliance upon the apparent authority of an agent, as follows:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

The 2006 version of this provision, Restatement (Third) of Agency § 2.03 (2006), states its formulation of the rule of apparent agency as follows:

> Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties *when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.*

(Emphasis added.)

Advertising and branding are the common means by which manifestations of apparent agency are made.[2] The manifestations should be interpreted according to what a third party reasonably understands, not by what the principal or agent knows or should have known.[3] Uniformity of signs, design and color scheme leads the public to believe that enterprises are under common ownership and that they conform to common standards.[4] A jury could reasonably find that Papa John's intended to persuade customers that it would provide the pizza McCoy purchased. The majority opinion fails to distinguish this case from the general rule of ostensible agency. Instead, it appears to have tailored a new rule, contrary to the Restatement and our decisions, to fit franchisors.

In this case, Appellant stated a claim for ostensible agency based on his belief that he was dealing with a national food vendor and its employees. Appellant had no reason to know that he was actually dealing with an employee of an unknown company, RWT, Inc., rather than Papa John's. He called a telephone number for Papa John's listed in the local phone book. There was no way for Appellant or other customers to know that they were dealing with a franchisee rather than the franchisor Papa John's. Nothing about the encounter informed McCoy that he would be dealing with an employee of a local franchisee rather than a Papa John's employee.

1. *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 257, 259 (Ky.1985).

2. *Billops v. Magness Const. Co.*, 391 A.2d 196, 198 (Del.1978).

3. *Paintsville Hospital*, 683 S.W.2d at 259, citing Restatement (Second) of Agency § 267.

4. *Orlando Executive Park, Inc. v. P.D.R.*, 402 So.2d 442, 450–451 (Fla.App.1981) (Howard Johnson's motor lodges).

Closely analogous to this case is a 1934 decision of this Court applying the doctrine of ostensible agency to an earlier era's franchisor. In *Middleton v. Frances*[5] a taxi cab owner arranged with the People's Taxie Company to use its offices and display its sign on his car for the purpose of soliciting and providing taxi transportation. People's Taxie did not own or control the car in question nor was the owner or operator of the car an employee of People's Taxie. When the operator negligently injured another, the question of ostensible agency arose. After noting that neither People's Taxie nor its owner had anything to do with the operation of the other car, the Court nevertheless held it liable for the damages.

> Has not the People's Taxie Company by allowing Harris from and after July 20, 1933, to operate this car from its central office, to cruise about over the city with the name "Peoples Taxi-cab Company" displayed upon it—though it be admitted he was doing all this for Ashley—been guilty of such want of ordinary care, and so held him out and so allowed Harris to hold himself out as to make Harris its agent as to third parties who perhaps took passage with him as a result of the appearances it allowed him to make? We think it has. Such seems to be the rule.[6]

It is naïve to suggest that one who orders pizza from Papa John's International is depending on only the "quality and expected taste of the pizzas ordered." One who chooses to purchase a national name brand product, does so on the assurances of quality, safety, and trust associated with the national brand. This includes the employees who prepare, serve and deliver the product. The decision goes far beyond the taste of the pizza. Particularly is this true when delivery of the product requires the purchaser to open his door to a stranger.

Appellant should have been permitted to prove his reliance on Papa John's. Questions of apparent agency are for the jury.[7] Thus, I would reverse the trial court's matter of law determination that Papa John's was not liable, and submit the apparent agency question to the jury.

---

5. 257 Ky. 42, 77 S.W.2d 425 (1934).

6. *Id.* at 426.

7. *City of Delta Junction v. Mack Trucks, Inc.,* 670 P.2d 1128, 1130 (Alaska 1983); *Crinkley v. Holiday Inns, Inc.,* 844 F.2d 156 (4th Cir. 1988); *Billops,* 391 A.2d at 199.