Carl BURKHEAD, Jr. Appellant

v.

Lori DAVIS,[1] Marty Davis, and Yvonne Davis, Appellees

and

Lorie Davis, Marty Davis, and Yvonne Davis Hoover, Cross–Appellants

v.

Carl Burkhead, Jr., Cross–Appellee

NO. 2014–CA–000012–MR, NO. 2014–CA–000024–MR

Court of Appeals of Kentucky.

NOVEMBER 23, 2016; 10:00 A.M.

---

1. In preparing the style of the case, we are guided by the notice of appeal, which in this case lists one of the appellee/cross-appellants as "Lori Davis." However, in her deposition, she spelled her name as "Lorie." We will follow her deposition and use the spelling "Lorie." Similarly, based on Yvonne Hoover's answers to interrogatories, we recognize her married name to be Yvonne Davis Hoover not Yvonne Hoover–Davis as reflected on the judgment being appealed.

BRIEFS FOR APPELLANT/CROSS–APPELLEE: James C. Nicholson, Louisville, Kentucky, J. Gregory Troutman, Louisville, Kentucky

BRIEF FOR APPELLEE/CROSS–APPELLANTS: Richard G. Segal, Louisville, Kentucky

BEFORE: ACREE, NICKELL AND TAYLOR, JUDGES.

OPINION

NICKELL, JUDGE:

Carl Burkhead, Jr., has appealed from the Bullitt Circuit Court's August 20, 2013, judgment entered following a jury trial awarding Marty Davis, Lorie Davis and Yvonne Davis Hoover compensatory and punitive damages on their malicious prosecution claim against him. The Davises and Hoover have cross-appealed from the same judgment. Following a careful review of the record, the briefs and the law, we affirm.

Yvonne owned a home located on Ellis Lane in Taylorsville, Kentucky, where her son Marty resided with his wife, Lorie. Burkhead resided next door to the Davises. The neighborly relationship started off relatively well when the Davises moved into the residence and remained so for several years. In 2000, Marty constructed a detached garage on his property. He and Burkhead spoke often, and no complaint was raised about the construction. During the building phase, Marty assisted Burkhead in clearing and grading a portion of Burkhead's lot to construct a similar garage. In the following years, however, the relationship between the neighbors became more and more acrimonious. Apparently, the friction began when the Davises refused Burkhead's request that they pay a portion of the cost of trimming a tree away from overhead power lines—an amount of approximately $20.00.

Following this incident, Burkhead began a series of complaints to government agencies regarding the Davis property, initially alleging the property was overgrown and needed to be "cleaned up." Marty was cited by the Bullitt County Planning and Zoning Department and ordered to clean up the property. Marty took appropriate action to comply. Burkhead then began complaining an unauthorized automobile repair business was being operated in the

garage[2] and overpowering paint fumes and overspray were interfering with his enjoyment of his own property. These complaints generated several investigations by the Bullitt County Enforcement Division of Solid Waste Management and the Kentucky Department of Environmental Protection. No violations were noted.

Burkhead also made numerous complaints to law enforcement. Records produced at trial indicate between June 2007 and June 2010 Burkhead was the complaining witness in no less than seven criminal cases against Marty and one against Lorie. All of the criminal charges were ultimately dismissed. Records also showed Burkhead contacted police in excess of 100 times regarding various activities on the Davis property; possible prowlers on his own property; bombs, guns and fireworks being discharged in the area; all-terrain vehicles operating on the roadway; loud noises; and several other complaints. On only one occasion did a responding officer note anything remotely out of the ordinary. During the same period, approximately eight calls for assistance were placed by Marty or Lorie concerning Burkhead's increasingly erratic behavior.

At some point, Burkhead installed three security cameras on his property which all looked into the Davis's back yard. The Davises noticed large areas of dead grass in their yard along the fence adjoining Burkhead's property. Bullet holes were found in the fence. While Marty was undertaking repairs of his garage following a suspicious fire in 2010 which also damaged a portion of Burkhead's fence, Burkhead made obscene gestures and screamed at Marty to "go and leave so I can come over and [expletive] up some more of your property." The Davises routinely found dents from ornamental stones being thrown atop the metal roof of their home on the side nearest Burkhead's property, and also sustained damage to two automobiles, a camper, and other personal property from stone strikes. These stones were averred to be identical to those located in Burkhead's garden.

On July 1, 2010, Burkhead instituted the instant suit, alleging the Davis's actions constituted a temporary private nuisance.[3] He sought to permanently enjoin the Davises from operating a business from their garage, touching his fence in any way, trespassing upon his property, and from speaking to him. In addition, Burkhead sought compensatory damages for the diminution in value of his property, the cost of repairing his fire-damaged fence, as well as punitive damages. In their answer, the Davises generally denied the allegations of the complaint.

Approximately eight months later, in February 2011, Burkhead filed an amended complaint alleging the Davis' garage was in violation of numerous zoning and property use restrictions, and again seeking injunctive relief. In response, the Davises again disputed the operative allegations of the complaint, and additionally filed counterclaims for malicious prosecution, outrageous conduct, abuse of process, invasion of privacy and nuisance. The Davises sought compensatory and punitive damages, as well as injunctive relief.

Following a lengthy period of discovery and two mistrials, the matter was finally tried to conclusion from July 16 through July 19, 2013. Before the case was given to the jury, the trial court directed verdicts on Burkhead's claims for zoning violations

---

**2.** The applicable zoning regulations did not permit operation of any businesses in this residential neighborhood.

**3.** *See* Kentucky Revised Statutes (KRS) 411.540.

based on the location of the Davis's garage, fire damage to his fence, nuisance due to paint fumes and overspray, and nuisance due to sound. Similarly, the trial court directed verdicts on the Davis's claims for invasion of privacy and abuse of process. The jury found the Davises had improperly used their property "for a club meeting house and/or excessive vehicular repairs" but awarded no damages. The jury found for Burkhead on his claim for nuisance and awarded $1.00 in damages. Burkhead's remaining claims were unanimously rejected by the jury. The jury found in favor of the Davises on their counter-claims for nuisance, outrageous conduct and malicious prosecution, and awarded them $500.00 in compensatory damages and $30,000.00 in punitive damages. The trial court entered its judgment in conformity with the jury's findings on August 20, 2013.

Subsequent proceedings were conducted relative to Burkhead's claim for equitable relief, resulting in a November 6, 2013, order enjoining the Davises from using the property as a club meeting location or for excessive vehicular repairs in violation of applicable zoning regulations. Burkhead then moved for a judgment notwithstanding the verdict or alternatively for a new trial, challenging the jury's award of punitive damages as being unconstitutionally excessive. He sought remittitur of the punitive award to four times the compensatory award or for a new trial on punitive damages. On December 13, 2013, the trial court denied Burkhead's post-judgment motion in a final and appealable order which further designated all prior orders as final and appealable. This appeal and cross-appeal followed.

Burkhead contends the trial court erred in denying his motion for a directed verdict on the Davis's malicious prosecution claim and challenges the jury's punitive

damages award as being unconstitutionally excessive. On cross-appeal, the Davises contend the trial court erred in refusing to admit three pieces of documentary evidence related to damages to their vehicles and roof. We shall address each allegation of error in turn.

■ First, Burkhead argues the trial court should have granted a directed verdict in his favor on the malicious prosecution claim. He argues Marty and Lorie stipulated to existence of probable cause underlying Burkhead's criminal complaints in each instance prior to the criminal charges being dismissed, thereby precluding any malicious prosecution claims as a matter of law. Burkhead contends Marty's post-dismissal attempt to alter the scope of the stipulations to encompass only the Bullitt County Attorney was no more than a ruse calculated to revive a mortally wounded cause of action. He believes the trial court's failure to so rule and subsequent denial of his directed verdict motion were erroneous and mandate reversal. We disagree.

■ In an action for malicious prosecution, a movant must show, among other things, lack of probable cause in the initiation of the prior judicial proceeding. *Broaddus v. Campbell*, 911 S.W.2d 281, 283 (Ky. App. 1995) (citing *Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981)). In *Broaddus*, this Court concluded Broaddus had stipulated probable cause in exchange for dismissal of an indictment against him and such stipulation barred a subsequent civil action for malicious prosecution. *Id.* The *Broaddus* Court also observed at the time Broaddus made the agreement, he could have structured the bargain to preserve a future claim for malicious prosecution against the complaining witness. *Id.* at 284.

In the instant matter, Marty insisted he was unaware a condition of dismissal of the criminal charges against him included stip-

ulating Burkhead had probable cause to institute the actions in the first place. Such a stipulation would, of course, have defeated any malicious prosecution actions by the Davises against Burkhead. Marty testified had he been aware of such a requirement, he would have insisted on going to trial as entering such a stipulation was tantamount to an admission of wrongdoing on his part. As soon as he learned about that portion of the bargain, Marty directed his counsel to take whatever action necessary to undo that part of the agreement. One week after the criminal charges were dismissed, the Bullitt District Court entered an order reflecting probable cause was stipulated only as to the County Attorney's office.

Burkhead argues the trial court should have disregarded the post-dismissal order and focused solely upon the original stipulation of probable cause. Had it done so and applied the holding in *Broaddus*, entry of a directed verdict in his favor would have been the only possible outcome. However, the trial court was not at liberty to simply disregard an otherwise validly entered, unchallenged and long-final order of another court.

Burkhead's challenge is nearly identical to one put forth and rejected in *Papa John's Intern., Inc. v. McCoy*, 244 S.W.3d 44 (Ky. 2008). In that case, over two years after probable cause was stipulated in exchange for dismissal of a criminal charge, and faced with a motion for summary judgment on a pending malicious prosecution claim stemming from that same criminal matter, McCoy surreptitiously obtained an amended judgment removing the probable cause stipulation. Papa John's argued the trial court should have disregarded the amended judgment, giving effect only to McCoy's initial probable cause stipulation which would have defeated the pending malicious prosecution claims. In rejecting Papa John's argument, our Supreme Court concluded "[t]he district court criminal proceedings, however, evade review. But they do not evade comment. Having reviewed the record, it is clear to us that McCoy's counsel was not forthcoming with the district court when he made his motion for an amended judgment to remove the probable cause stipulation." *Id.* at 54. We likewise reject Burkhead's invitation to overturn—or at least overlook—a validly entered order which is not properly before us to review. There was no reversible error.

■ In a peripheral argument, Burkhead claims the trial court improperly instructed the jury to determine damages on an aggregate basis for the nuisance, outrageous conduct and malicious prosecution claims. Our review of the record indicates this argument is wholly unsupported and without merit. In discussing the proposed instructions, Burkhead's counsel actually requested an aggregate instruction be given, explaining the Davises were entitled to only one measure of damages, regardless of the theory under which the damages were claimed. The only true challenge Burkhead mounted relative to the compensatory damages instruction was the appropriate "not to exceed" amount to be included. Having requested the instruction as given by the trial court, and having raised the instant allegation of impropriety in the instruction for the first time on appeal, Burkhead cannot now be heard to complain. *See* RCr [4] 9.54.

■ Next, Burkhead argues the trial court erred in failing to grant his motion for a judgment notwithstanding the verdict based on his belief the punitive damage award was unconstitutionally excessive.

---

4. Kentucky Rules of Criminal Procedure.

Burkhead contends a comparison of the punitive damages awarded in this case, $ 30,000.00, and the compensatory damages awarded, $ 500.00, yields a ratio of punitive damages to compensatory damages that violates the Fourteenth Amendment Due Process Clause, and is therefore contrary to United States Supreme Court decisions imposing due process limitations on punitive damages awards.[5] *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). As such, this argument presents a constitutional challenge to the punitive damages award in this case. In its constitutional analysis of punitive damages awards, the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore,* 517 U.S. at 582–83, 116 S.Ct. 1589.

■ Constitutional challenges alleging excessiveness of punitive damages awards are reviewed *de novo. Ragland v. DiGiuro,* 352 S.W.3d 908, 917 (Ky. App. 2010) (citing *Steel Technologies, Inc. v. Congleton,* 234 S.W.3d 920, 931 (Ky. 2007) and *Cooper Industries,* 532 U.S. at 437, 121 S.Ct. 1678). "Unlike the measure of actual damages suffered, which presents a question of historical or predictive fact ... the level of punitive damages is not really a 'fact' 'tried' by the jury." *Cooper Industries,* 532 U.S. at 437, 121 S.Ct. at 1686 (quoting *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 459, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (SCALIA, J., dissenting)). *Gore* provides a firmly-established blueprint for undertaking that *de novo* review.

■ As noted in *Ragland,* 352 S.W.3d at 917, the Supreme Court in *Gore* instructed reviewing courts to consider three "guideposts" in reviewing the constitutionality of a punitive damages award:

1) the degree of reprehensibility of the defendant's conduct;
2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and
3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

■ Additional consideration is required "where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589). Ultimately, each case must stand on its own facts with the decisive measure being reasonableness of the award under the circumstances. "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus." *Id.* (quoting *TXO Production Corporation v. Alliance Resources Corporation,* 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)).

### 1. Degree of Reprehensibility

■ "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Ragland,* 352 S.W.3d at 917 (quoting *Gore,*

---

**5.** The punitive damages/compensatory damages ratio is $ 30,000/$ 500, or 60:1.

517 U.S. at 575, 116 S.Ct. 1589). This is so because "a jury has a 'somewhat superior vantage' over reviewing courts 'with respect to the first *Gore* inquiry ... primarily with respect to issues turning on witness credibility and demeanor.'" *Id.* (quoting *Cooper Industries*, 532 U.S. at 440, 121 S.Ct. 1678). "After all, a punitive damage award is an expression of ... moral condemnation by the voice of the community." *Id.* (citations and internal quotation marks omitted).

In *Campbell,* the Supreme Court identified "reprehensibility" as the most important guidepost, citing five factors for assessing reprehensibility of the conduct under review.

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. [*Gore*], at 576–577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Campbell,* 538 U.S. at 419, 123 S.Ct. 1513. *See also Ragland,* 352 S.W.3d at 917.

The application of *Campbell's* five reprehensibility factors weighs against Burkhead. The resulting harm was not merely economic; it was clearly physical, with the Davises being subjected to numerous unwarranted interactions with police—many of which occurred during the overnight hours and one resulting in a very public arrest on unjustified criminal charges; institution of no less than six criminal cases against Marty and Lorie which were all dismissed prior to trial; groundless investigations by numerous state agencies; and damages sustained to their real and personal property. In rather dramatic fashion over the course of at least six years, the offensive conduct exhibited a gross indifference to, and a reckless disregard for, the Davis's health and safety. There was clearly a pattern of repeated conduct calculated to harass, annoy or harm the Davises and interrupt their daily lives. The harm that befell the Davises was not accidental; they were intentionally targeted by Burkhead and became the objects of his wrath. The ever-present threats to their safety, well-being, and even freedom, manifested a measure of ill-will commensurate with malice. The only reprehensibility factor potentially favoring Burkhead is financial vulnerability, as no evidence was presented showing the Davises were in such a position. Overall, these five factors weigh heavily in support of the jury's punitive damages verdict.

### 2. The Punitive/Compensatory Damages Ratio

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore,* 517 U.S. at 580, 116 S.Ct. at 1601. The punitive damages in the amount of $30,000.00 and compensatory damages assessed against Burkhead in the amount of $500.00 equates to a ratio of 60 to 1. Burkhead contends this ratio is, as a matter of law, outside the constitutional parameters established in *Gore, Campbell,* and *Cooper Industries.*

As noted above, the Supreme Court has not identified "concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive

damages award[.]" *Campbell*, 538 U.S. at 424, 123 S.Ct. 1513. Instead, it has "consistently rejected" the constitutional evaluation of punitive damages "by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore*, 517 U.S. at 582, 116 S.Ct. 1589. *Campbell* emphasized there is no "bright-line ratio which a punitive damages award cannot exceed." 538 U.S. at 425, 123 S.Ct. 1513. However, *Campbell* also recognized, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* Thus, while the Supreme Court has made it clear the question is not governed by a mathematical formula, it is equally clear punitive/compensatory damages ratios of 10:1 and greater are burdened with at least the appearance of unconstitutionality and cannot survive appellate scrutiny in the absence of special circumstances.

One circumstance identified by the United States Supreme Court where constitutionality of a punitive damages award will not be affected by a damage ratio exceeding single-digits occurs in *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589). "[R]atios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* The Supreme Court acknowledged, "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U.S. at 568, 116 S.Ct.

1589. It was further recognized that states have latitude to exceed the single-digit rule in exceptional circumstances, including where economic damages are relatively low and the conduct is particularly egregious. In such cases, a much higher ratio is "reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence." *Id.*

The case at bar presents the very circumstances contemplated in *Campbell* and *Gore* as an exception to the single-digit ratio limitation: two extraordinary and compelling circumstances intersect in a way that dissolves constitutional doubt about a very large punitive/compensatory damages ratio. First, Burkhead's increasingly erratic and offensive conduct resulted in likewise increasingly dangerous and damaging impacts on the Davises, thus justifying in the minds of reasonable jurors a greater award of punitive damages. It is axiomatic the amount of punitive damages varies directly with the egregiousness of the offensive conduct. Second, the physical damage to the Davis's property—dead grass, bullet holes in the fence, dents on vehicles and the roof of the home, and broken glass—was relatively minor insofar as the evidence presented at trial revealed. In contrast, economic value of the emotional and psychological damages resulting from Burkhead's conduct was difficult, if not impossible, to quantify. The compensatory damages that would ordinarily arise from these injuries would correspondingly be relatively small.

Convergence of these circumstances set the stage for a high punitive/compensatory damages ratio, well beyond the single-digit range, making this a proper case for application of the *Gore–Campbell* exception. In *TXO Production Corporation v. Alliance Resources Corporation*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), a punitive/compensatory damages ratio of 526:1

was upheld, based on a punitive damage award of $ 10 million compared to compensatory damages of just $ 19,000.00 in a case involving a slander of title claim. The Ohio Supreme Court in *Wightman v. Consolidated Rail Corporation*, 86 Ohio St.3d 431, 715 N.E.2d 546 (1999), upheld a punitive damage/compensatory ratio of 6,250:1 in a case involving a train-car collision at an unsafe railroad crossing. Recently, in *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864 (Ky. 2016), our Supreme Court upheld a punitive damage/compensatory ratio of 386:1 in a case involving the death of a paraplegic man who was wrongfully discharged from a hospital. In all of these cases, much like the one at bar, existence of noneconomic harm with a value difficult to discern played heavily into the "constitutional calculus." Application of the Supreme Court's analysis in *Gore*, *Campbell*, *Cooper Industries* and other similar cases cited above, leads us to conclude the punitive damages award is not unconstitutionally disproportionate to the losses—both economic and noneconomic—resulting from Burkhead's lengthy harassment, nuisance, outrageous conduct, and malicious prosecutions of the Davises.

### 3. The Possible Civil or Criminal Penalties

■ The third guidepost in *Gore* is disparity between "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct[.]" *Gore*, 517 U.S. at 583, 116 S.Ct. 1589. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (citation and internal quotation marks omitted).

There are two possible criminal actions to which Burkhead's conduct could be equated, criminal mischief in the first degree, KRS 512.020, a Class D felony, and falsely reporting an incident, KRS 519.040, a Class A misdemeanor. The potential fine following conviction for a Class D felony is $ 1,000.00 to $ 10,000.00, while the potential fine for Class A misdemeanors is up to $ 500.00. Based on the evidence presented to the jury, Burkhead could clearly have been subject to numerous counts of each of these crimes, and the possible fines would easily have been in excess of the $ 30,-000.00 awarded by the jury. If one looked only to the number of unjustified 911 calls placed by Burkhead—over 100—the potential fines for the misdemeanor charges alone would exceed $ 50,000.00. Thus, the third *Gore* factor favors the jury's award.

For the foregoing reasons, we find no merit in Burkhead's contentions. We shift our attention to the issue raised in the Davis's cross-appeal.

■ The Davises raise a single challenge to the trial court's rulings. They contend the trial court erred in refusing to permit them to introduce estimates for necessary repairs to their two vehicles and the roof of their house occasioned by Burkhead's rock throwing. They contend the trial court's ruling prohibited the jury from considering their actual economic damages which exceeded $ 5,000.00. The trial court rejected the proffered evidence as unsupported hearsay lacking any authentication by the entities who prepared the estimates.

■ We review a trial court's decision to admit or exclude evidence under the abuse of discretion standard. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Id.* at 581 (citing *Commonwealth v. English*, 993 S.W.2d 941, 945

(Ky. 1999)). Following a careful review of the record, we are unable to discern any abuse of discretion.

At trial, the Davises attempted to introduce through Marty three repair estimates concerning damage to their vehicles and roof. The trial court disallowed introduction of the documents because the estimates were wholly unauthenticated. While we agree with the Davises that expert testimony is not required to prove diminution in value of real or personal property resulting from damages caused by another, in the case *sub judice*, no evidence relating to the reduction in fair market value was presented or offered. Instead, Marty attempted to testify as to the contents of a document prepared by a third party in an attempt to prove the truth of the matters asserted therein. As the trial court correctly observed, this is precisely the type of hearsay testimony defined in

**6.** Kentucky Rules of Evidence.

KRE [6] 801(c) and prohibited by KRE 802. The Davises offered no argument the proffered evidence fell under any exception to the hearsay rule and made no attempt to authenticate the documents or their contents. Under the circumstances, we agree with the trial court. The estimates constituted inadmissible hearsay and were properly excluded.

Having discerned no errors in the proceedings, the judgment of the Bullitt Circuit Court is AFFIRMED.

ALL CONCUR.