Tommie Lee PATTERSON, Appellant,

v.

Thomas C. BLAIR, Jr.; and Tommy Blair, Inc., d/b/a Courtesy Autoplex, Appellees.

No. 2003–SC–000646–DG.

Supreme Court of Kentucky.

Sept. 22, 2005.

---

35. Quisenberry v. Quisenberry, 785 S.W.2d 485 (Ky.1990).

36. Id.

37. 41 S.W.3d 866, 867 (Ky.App.2001).

38. Id.

James W. Owens, Chartered, Donald R. Green, Jr., Paducah, Counsel for Appellant.

Mark D. Pierce, Paducah, Counsel for Appellees.

Opinion of the Court by Justice ROACH.

## I. INTRODUCTION

Tommie Lee Patterson brought suit against Thomas Blair, Jr. ("Blair, Jr.") and Tommy Blair, Inc., d/b/a Courtesy Autoplex ("Courtesy"). Patterson alleged several causes of action against Blair, Jr. and claimed that Courtesy was vicariously liable for the tortious acts of its employee, Blair, Jr. A jury awarded Patterson damages of $42,465.18 and found that Courtesy was vicariously liable for Blair, Jr.'s conduct. A divided panel of the Court of Appeals held that Blair, Jr. was not acting within the scope of his employment and therefore concluded that Courtesy could not be held liable under respondeat superior. The entire Court of Appeals panel,

however, agreed that the trial court's denial of Patterson's requested instruction on punitive damages was in error.[1] This Court granted discretionary review to consider whether the jury's verdict, holding Courtesy vicariously liable for Blair, Jr.'s actions, should be upheld. Having determined that the jury correctly determined that Blair, Jr. was acting within the scope of employment when he assaulted Patterson, we reverse the Court of Appeals and reinstate the jury's verdict against Courtesy.

## II. FACTS

On September 28, 1995, Patterson entered into an agreement with Courtesy to trade his Camaro for a new 1995 GMC Jimmy. At the time of the trade, Patterson owed $12,402.82 on the Camaro. Despite this, he incorrectly informed Courtesy that he owed only $9,500.00 on the car. The transaction occurred at a time when the bank was closed and Courtesy could not verify the payoff amount on the loan. Courtesy allowed Patterson to take possession of the Jimmy, but did not transfer title. An agreement was also executed providing that Courtesy would credit Patterson if he had overstated his outstanding indebtedness on the Camaro and, likewise, that he would pay the difference if his figure understated that amount. When the bank opened the next day, Courtesy discovered the amount Patterson actually owed on the Camaro. When notified of this discrepancy, Patterson refused to pay the additional sum and refused to return the Jimmy. Courtesy subsequently tried unsuccessfully to repossess the truck on at least two occasions.

On October 4, 1995, after investigating where he could find Patterson, Blair, Jr. and another Courtesy employee encountered Patterson, who was driving the Jimmy, on a public road. At a stoplight, Blair, Jr. exited his car and knocked on the Jimmy's driver-side window, demanding that Patterson get out of the vehicle. When Patterson refused, Blair, Jr. drew a pistol he was carrying and fired two shots in the front tire and two shots in the rear tire of the Jimmy. Ultimately, the disabled truck was impounded and returned to Courtesy by the police.

Courtesy obtained a judgment against Patterson for the Jimmy's loss in value. Citizens Bank, which had financed the Camaro that had been traded-in, obtained a judgment against Patterson for the remaining sum owed on its loan. Blair, Jr. was criminally prosecuted and was convicted of wanton endangerment in the first degree, a felony. Patterson sued Blair, Jr. and Courtesy under several different tort theories. At trial, the jury was instructed on assault and the theory of vicarious liability, allowing the jury to impute liability to Courtesy for the actions of its agent, Blair, Jr.

## III. DISCUSSION

Stated generally, the doctrine of respondeat superior, also called vicarious liability, provides the legal rationale for holding a master responsible for a tort committed by his servant. The origins of the doctrine of respondeat superior run deep in the common law. As Blackstone explained: "As for those things which a servant may do on behalf of his master, they seem all to proceed upon this principle, that the master is answerable for the act of his servant if done by his command either expressly given or implied...." 1 William Blackstone, *Commentaries on the Law of Eng-*

---

1. Discretionary review was not sought on this ruling of the Court of Appeals and is not before this Court.

*land* 429 (1765). Not surprisingly, vicarious liability is a long-standing principle of Kentucky's tort law.

## A. The Rationale

Over the years, commentators have offered various justifications in support of respondeat superior liability. For instance, Judge Posner explained that the principle has sometimes been thought of as an example of the law's sympathy to "deep-pocket" arguments. Richard A. Posner, *Economic Analysis of Law* § 6.8, at 204–05 (5th ed. 1998) [hereinafter Posner, *Economic Analysis*]. Simply put, because employees often lack sufficient assets to pay tort judgments, respondeat superior is necessary to allow victims to reach into employers' deep-pockets for compensation. Ultimately, however, this is an unsatisfactory, or at least incomplete, explanation, *id.*, especially since the principle of respondeat superior evolved during a period in which the common law was not noted for its sympathy toward accident victims. Moreover, there are now limits on the employer's liability. The employer is strictly liable only for damages resulting from the tortious acts of his employees. A victim injured by an employee who is exercising due care and who has not acted intentionally has no claim against the employer. And the employer is only liable for acts of his employee committed in the scope of the employment. *See id.* (specifically noting this requirement as proof of "the inadequacy of a pure deep-pocket explanation for respondeat superior").

Thus, it is clear that the justification for the rule has to be more than just forcing the employer to compensate victims because he can afford to do so. Various judges and commentators have recognized this inadequacy and have offered myriad alternate, or at least supplemental, and more robust rationales for the rule. *See*

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 500 (5th ed. 1984) [hereinafter Prosser and Keeton] (discussing the "multitude of very ingenious reasons" in support of vicarious liability).

One of these supplemental rationales for respondeat superior liability can be found in the field of economics.

The economic explanation for respondeat superior focuses first on the complete helplessness of the accident victim to avoid incorrect employment decisions by exercising care or by altering his activity. This in itself would be an insufficient reason for imposing strict liability if the employer could always or at least most of the time prevent negligence by his employees simply by exercising care in his selection and supervision of them. But employees will sometimes be careless even if they are carefully screened and supervised, if only because their lack of ready assets reduces their financial incentives to take care. And there are a number of activity measures (as distinct from care measures) that an employer can take to reduce accident behavior by his employees, including delegating more work to independent contractors and giving employees simpler tasks requiring less care.

However, the most important reason for respondeat superior is the fact mentioned that employees often cannot pay a tort judgment against them. Our point is not a deep-pocket point; it is that the employer can use the threat of termination as a substitute for employee tort liability in inducing employees to act with due care, and that he will do so only if the employee's carelessness is a cost to him. Making the employer liable for his employee's tort serves to enlist the employer as a substitute enforcer of tort law where the primary enforcement

mechanism, a tort action against the immediate tortfeasor, is unworkable.

William M. Landes and Richard A. Posner, *The Economic Structure of Tort Law* 120–21 (1987) [hereinafter Landes and Posner]; *see also* Posner, *Economic Analysis* § 6.8, at 204–05 ("The rationale for [respondeat superior] is that most employees lack the resources to pay a judgment if they injure someone seriously. They therefore are not very responsive to the threat of tort liability. The employer, however, can induce them to be careful, as by firing or otherwise penalizing them for their carelessness.... Making the employer liable for his employees' torts will give him an incentive to use such inducements."); Alan O. Sykes, *The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines*, 101 Harv. L.Rev. 563 (1988) (discussing the economic efficiency of vicarious liability).

The Prosser and Keeton treatise offers a similar explanation:

> What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large. Added to this is the make-weight argument that an employer who is held strictly liable is under the greatest incentive to be careful in the selection, instruction and supervision of his servants, and to take every precaution to see that the enterprise is conducted safely. Notwithstanding the occasional condemnation of the entire doctrine which used to appear in the past, the tendency is clearly to justify it on such grounds, and gradually to extend it.

Prosser and Keeton at 500–01 (footnotes omitted).

In 1936, our own predecessor court explained the purpose of the doctrine as follows:

> The doctrine of respondeat superior is at best a harsh rule, dictated by considerations of public policy and the necessity for holding a responsible person liable for the acts done by others in the prosecution of his business, as well as for placing on employers an incentive to hire only careful employees.

*Johnson v. Brewer*, 266 Ky. 314, 98 S.W.2d 889, 891 (1936).

In *Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167 (2d Cir.1968), one of the most cited respondeat superior cases involving an intentional tort, Judge Friendly rejected many of the traditional justifications for the doctrine, focusing instead on the activities of the business enterprise. In *Bushey*, a drunken sailor returned to his ship and opened valves that flooded a drydock, damaging both the ship and the drydock. Judge Friendly rejected many of the traditional policy arguments that have been offered in support of respondeat superior liability. *Id.* at 170–71. He noted that even though the drunken sailor was not motivated by a purpose to serve his employer, respondeat superior liability was proper. This liability rested on the fact that the "business enterprise cannot justly disclaim responsibility for ac-

cidents which may be fairly said to be characteristic of its activities" and that the sailor's conduct "was not so unforeseeable as to make it unfair to charge the government with responsibility." *Id.* at 171 (internal quotation marks omitted).

### B. The Rule for Intentional Torts

Though the foregoing discussion is, no doubt, more academic than may seem necessary, an understanding of the competing rationales for the doctrine of respondeat superior is at least helpful, if not necessary, in determining the contours of the rule to be applied to the intentional torts of employees. As noted above, an employer's liability is limited only to those employee actions committed in the scope of employment. The central difficulty in applying the rule of respondeat superior focuses on this concept, especially when the tort in question was intentional (as opposed to merely the result of negligence). Thus, the question inevitably arises: What does "scope of employment" mean?

Judge Friendly applied the standard of foreseeability as the benchmark for scope of employment. He discussed foreseeability in the following manner:

> Here it was foreseeable that crewmembers crossing the drydock might do damage, negligently or even intentionally, such as pushing a Bushey employee or kicking property into the water. Moreover, the proclivity of seamen to find solace for solitude by copious resort to the bottle while ashore has been noted in opinions too numerous to warrant citation. Once all this is granted, it is immaterial that Lane's precise action was not to be foreseen.

*Bushey,* 398 F.2d at 172.

The most prominent alternative to the foreseeability standard is the principle that an action is only within the scope of em-

ployment when the employee intends to further the employer's business or advance the employer's goal. Prosser and Keeton state that "in general, . . . the master is held liable for any intentional tort committed by the servant where its purpose, however misguided, is wholly or in part to further the master's business." Prosser and Keeton at 505. In explaining this principle, they offer the following example of the rule in action:

> Thus a railway ticket agent who assaults, arrests or slanders a passenger, in the belief that he has been given a counterfeit bill for a ticket, is within the scope of employment, although the employer has not authorized such conduct, or has even expressly prohibited it. But if he acts from purely personal motives, because of a quarrel over his wife which is in no way connected with the employer's interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable.

*Id.* at 506.

Landes and Posner agree that this is the appropriate rule. They state that

> in the case of an intentional tort the court is likely to insist in addition that the employee in committing the tort have been trying, however misguidedly, to advance the employer's goals, as where the employee assaults a debtor of the employer in an effort to collect the debt. If the employee is actuated by purely personal motives, the employer's practical ability to prevent the tort will be slight. The employer should be able to ensure that the employee not only use due care but also avoid overzealous pursuit of the employer's goals, but it is much harder for the employer to screen and monitor employees for purely personal attitudes.

Landes and Posner at 208–09. This rule differs significantly than the one proffered by Judge Friendly in that it depends on the employee's motivation in acting, not on whether his or her action is foreseeable.

As the preceding discussion demonstrates, how one defines the scope of employment is the crucial inquiry.[2] And while the opinions of the likes of Deans Prosser and Keeton and Judges Friendly and Posner on this issue are illuminating, we must ultimately turn to our precedent to define the standard to be applied in Kentucky.

In *Frederick v. Collins*, 378 S.W.2d 617 (Ky.1964), an employee of a neighborhood grocery shot and killed a frequent patron of the store who disguised his voice and said "Stick'em up; this is a hold up." The employee turned around, hit the patron in the face with a gun, and shot him without realizing who it was. The employee was the storeowner's son. The owner testified that he did not know his son had a gun and that he had frequently instructed all of his employees, including his son, never to resist a holdup. *Id.* at 618. The question before the Court was whether the owner could be held vicariously liable for the shooting, an intentional tort. The Court noted that Prosser had recognized "that even intentional torts may be so reasonably connected with the employment as to fall within the scope of it. The present tendency is to extend the employer's responsibility for such conduct." *Id.* (internal citation omitted). The Court then favorably cited § 245 of the Second Restatement of Agency, which states that the master is liable "for the intended tortious harm by a servant to the person or things of another by an act done in connection with the servant's employment, although the act was unauthorized, if the act was not unexpectable in view of the duties of the servant."

In finding that the employee was acting within the scope of employment, the Court placed great weight on his motive for the shooting. The Court stated:

In the case at bar Robert was admittedly the appellant's employee; moreover, he was in sole charge of the store at the time of the incident. Without doubt Robert Frederick was under obligation generally to manage and protect the appellant's store and its contents. There *is no evidence that Robert sought to serve any personal purpose in his activity* toward Collins. In fact, Robert asserted that he did not know whom he was shooting—that he acted in self-defense. He actually testified that he would have shot his father or brother under the same circumstances. So it is obvious that this case is not governed by any of the authorities which deny liability because the employee has acted in furtherance of a personal motive as distinguished from a motive connected with the employer's business.

*Frederick*, 378 S.W.2d at 619 (emphasis added).

*Wood v. Southeastern Greyhound Lines*, 302 Ky. 110, 194 S.W.2d 81 (1946), also contains a detailed discussion of respondeat superior. In *Wood*, after a car entered the highway, a bus driver for Southeastern Greyhound crowded the car and forced it off the road. After the car regained the

---

2. It should be noted that our discussion is limited to an employer's liability based on the doctrine of respondeat superior. There are other theories of liability based on general negligence principles. *See, e.g., O'Roark v. Gergley*, 497 S.W.2d 931 (Ky.1973) (duty to stop employee from assaulting patron when employer sees employee committing the assault); *Oakley v. Flor–Shin, Inc.*, 964 S.W.2d 438 (Ky.App.1998) (negligent hiring and retention).

highway, it continued traveling, eventually stopping in Williamstown. When the car stopped, the bus driver also stopped, leaving the bus in the middle of the road, and proceeded to assault the driver of the car. The Court concluded that the bus driver was not acting within the scope of employment. The Court explained:

> It is clear the rule of *respondeat superior cannot be invoked and the employer be held liable where the action of the employee was motivated by conceptions of personal wrong or the invasion of his private rights.* And though there is some conflict of opinion, the trend of the decisions is to exonerate the principal where the act was not for the protection of his property or interests, but was to vindicate public justice or to redress an offense against society, or to punish an offender for something already done, although the wrongful act had its origin in some agency relation.

*Id.* at 82 (citations omitted, emphasis added).

The Court then discussed other cases and authorities, synthesizing the rule in the following manner:

> And now, in collating these authorities and principles, it seems clear to us that in order to hold an employer responsible to a third person for the tortious act of an employee of the former, such act must have been committed while the employee was engaged in furthering his employer's business or interests, without any deviation by the employee to a pursuit of his own business or interest, and there must have been a general similarity between the tortious act committed and the usual, ordinary, everyday acts commonly pursued by the employee in prosecuting the regular routine of his employment.

*Id.* at 83. The Court further noted that

> we see no marked, or even faint, resemblance between the bus driver's fisti-cuffs, on the one hand, and the bus driver's customary duties of starting, guiding, stopping and safely operating appellee's busses, on the other hand, especially so in view of the fact that this assaulted appellant was not related to the bus driver's employer as a passenger, customer, employee or otherwise. This bus driver's attack and his usual bus driving employment bore no more similarity to each other than a plug horse bears to 'Man O' War,' according to our perspective of these two separate activities.

*Id.*

In *Osborne v. Payne*, 31 S.W.3d 911 (Ky.2000), a former husband sought to impose vicarious liability against a Roman Catholic Diocese for a priest's allegedly outrageous actions associated with an affair with his wife. This Court held that the Diocese was not liable under respondeat superior and explained:

> The critical analysis is whether the employee or agent was acting within the scope of his employment at the time of his tortious act. *Wood v. Southeastern Greyhound Lines*, 302 Ky. 110, 194 S.W.2d 81 (Ky.1946), provides that for it to be within the scope of its employment, the conduct must be of the same general nature as that authorized or incidental to the conduct authorized. A principal is not liable under the doctrine of respondeat superior unless the intentional wrongs of the agent were calculated to advance the cause of the principal or were appropriate to the normal scope of the operator's employment. *Hennis v. B.F. Goodrich Co., Inc.*, Ky., 349 S.W.2d 680 (1961). In this situation, it is the abuse by the priest of his position that exceeds the scope of his employment. It is beyond question that Osborne was not advancing any cause of

the diocese or engaging in behavior appropriate to the normal scope of his employment.

*Id.* at 915.

In discussing statutory civil rights actions relying on a theory of vicarious liability, this Court recently noted:

> Vicarious liability, sometimes referred to as the doctrine of respondeat superior, is not predicated upon a tortious act of the employer but upon the imputation to the employer of a tortious act of the employee by considerations of public policy and the necessity for holding a responsible person liable for the acts done by others in the prosecution of his business, as well as for placing on employers an incentive to hire only careful employees. *Ordinarily, an employer is not vicariously liable for an intentional tort of an employee not actuated by a purpose to serve the employer* but motivated, as here, solely by a desire to satisfy the employee's own sexual proclivities.

*American Gen. Life & Accident Ins. Co. v. Hall,* 74 S.W.3d 688, 692 (Ky.2002) (internal citation and quotation marks omitted, emphasis added).

Despite the fact that this Court has cited to varying authorities to explain its holdings in the area of intentional torts, we have, with few exceptions, focused on the motive of the employee in determining whether he or she was acting within the scope of employment. Although in certain cases we have paid lip service to the principle of the foreseeability of the misconduct that was advanced by Judge Friendly in *Bushey,* our substantive focus has remained on the servant's purpose or motive. It is quite possible that had *Bushey* been decided under Kentucky law, the employer would not have been held liable for the drunken sailor's conduct because the drunken sailor was "not actuated by a purpose to serve the employer." *Hall,* 74

S.W.3d at 692. It is clear, however, that Kentucky law has rejected Judge Friendly's approach, which focuses exclusively on foreseeability and refuses to consider motive.

Instead, Kentucky's approach is precisely the standard advanced by Prosser and Keeton when they explained that "in general, ... the master is held liable for any intentional tort committed by the servant where its purpose, however misguided, is wholly or in part to further the master's business." Prosser and Keeton at 505. Thus, if the servant "acts from purely personal motives ... which [are] in no way connected with the employer's interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable." *Id.* at 506. This sound approach also conforms to the economic theory of vicarious liability, discussed above, because when the employee acts for solely personal reasons, the employer's ability to prevent the tort is limited. *See* Landes and Posner at 208–09.

In fact, Kentucky's emphasis on employee motive has been embraced in the Tentative Draft of the Third Restatement of Agency. The Tentative Draft rejects formulations based on assessments of foreseeability and instead states that an "employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (Third) of Agency § 7.07 (Tentative Draft No. 5, 2004). In explaining this change from the Second Restatement of Agency, the commentators state that "[a]lthough formulations that focus on an employee's intention may be difficult to apply in some cases, formulations based on assessments of 'forseeability' are potentially confusing and may generate outcomes that are less predictable

than intent-based formulations." *Id.* § 7.07 cmt. b.

A review of *Wood, Frederick* and *Osborne* makes clear that each of those cases focused on the servant's purpose for the intentional act that was perpetrated. Both the bus driver in *Wood* and the priest in *Osborne* committed acts based on purely personal motives, which were in no way connected with the employer's interests. On the other hand, in *Frederick,* the employee's misguided decision to shoot his supposed assailant was based solely on a business motive—to protect the store—and liability was proper even though the employer had forbidden such an action.

The Court of Appeals in this case relied on *Citizens Finance Co. v. Walton,* 239 S.W.2d 77 (Ky.1951), to support its holding that Blair, Jr. was not acting within the scope of employment when he confronted Patterson. In *Walton,* a finance company sent a debt collector to collect money from the plaintiff, and the employee struck and twisted the hand of the plaintiff. The Court concluded that the employee was not acting within the scope of employment. The Court ultimately rested its holding on foreseeability, explaining that "[t]he duty imposed upon Hensley to collect money did not carry with it as a reasonably contemplated act, the authority to assault Mrs. Walton." *Id.* at 78. This holding *is* consistent with an example noted in the Second Restatement of Agency, which states:

> Thus, one who is sent to collect a bill does not normally make the employer responsible if he seizes money from the debtor, since this would be an unusual and unexpectable proceeding of a bill collector. On the other hand, one who is sent to recapture property is likely to come into contact with a possessor un-

willing to surrender it, and persons sent to recapture goods are frequently the kind who would be not unlikely to attempt force.

Restatement (Second) of Agency § 245 cmt. a (1958).[3]

Simply put, *Walton* is an aberration in our case law, and no Kentucky court has relied on it, at least any published decision, to find vicarious liability. In fact, in *Bingham v. Commercial Credit Corporation,* 330 S.W.2d 427 (Ky.1959), the Court, when faced with an identical fact situation, declined to follow *Walton.* Instead, the Court noted that there were divergent views on the issue among the states, and focused on another factor that survives today under all theories of determining respondeat superior liability, namely the effect of the criminal nature of the employee's activity. The *Bingham* Court cited the Second Restatement of Agency for the proposition that whether the servant engaged in "a crime, especially if the crime is of some magnitude," should be considered in determining whether or not the act is within the scope of employment. *Id.* at 428 (quoting Restatement (Second) of Agency § 231(a)).

The consideration of whether the conduct was criminal conduct also survives under the Tentative Draft of the Third Restatement of Agency. The Draft states:

> In determining whether an employee's tortious conduct is within the scope of employment, the nature of the tort is relevant, as is whether the conduct also constitutes a criminal act. An employee's intentionally criminal conduct may indicate a departure from conduct within the scope of employment, not a single escalation.

---

**3.** As the Restatement demonstrates, even if we were to focus on foreseeability, Blair, Jr.'s actions to repossess property were foreseeable if he was sent to repossess the vehicle.

Restatement (Third) of Agency § 7.07 cmt. c (Tentative Draft No. 5, 2004). Prosser and Keeton also note that "[w]here the conduct of the servant is unprovoked, highly unusual, and quite outrageous, there has been something of a tendency to find that this in itself is sufficient to indicate that the motive was a purely personal one, but it seems clear that this cannot hold true in all cases." Prosser and Keeton at 506 (footnotes omitted).

## C. Application of the Rule

■ In order to evaluate the appropriateness of respondeat superior liability in this matter, we must discuss the applicable facts at length. Given the jury's verdict for Patterson, we are charged as an appellate court with "viewing the evidence from a standpoint most favorable to the prevailing party" since "the verdict of the jury resolves any conflicts in the testimony and also any conflicts in the reasonable inferences to be drawn from the testimony in favor of the prevailing party. . . ." *Horton v. Union Light, Heat & Power Co.,* 690 S.W.2d 382, 385 (Ky.1985). The following facts became apparent from an extensive review of the testimony offered at trial.

Tommy Blair, Sr. ("Blair, Sr.") was the sole owner and president of Courtesy. He had been in the automobile business for 35 years and had operated Courtesy for 22 years. His son, Blair, Jr., had worked for Courtesy for 22 years and was at the time of the incident the service manager for Courtesy. Blair, Jr., with his father's permission, represented himself as Vice President of Courtesy. Blair, Jr. was a management employee and supervised employees within the service department.

On October 2, 1995, after attempting to work with Patterson to resolve the payment issue, Blair, Sr. became convinced that Patterson would not voluntarily give up the Jimmy. Shortly thereafter, two Courtesy employees, Michael Moore and Chris Wathen, tried to repossess the truck at Patterson's home, but they were unsuccessful because the key they had made did not work. Moore testified that Patterson confronted them during this attempted repossession and threatened to kill them. Moore informed Blair, Jr. that he thought Patterson was crazy and that he would not go back to attempt to retrieve the Jimmy. Blair, Sr. testified that Courtesy had several employees out trying to recover the truck from Patterson and that he knew his son was among those employees. In addition to the incident involving Moore, Wathen, and Patterson, there had been several other attempts to locate and retrieve the truck.

In explaining his decision to find Patterson on October 4th, 1995, Blair, Jr. testified that the purpose of his confrontation with Patterson was to retrieve "our property" and repossess the vehicle for Courtesy. Chris Wathen accompanied Blair, Jr. to confront Patterson. Blair, Jr. also testified that he carried a gun with him anytime he was outside the office and that he made no attempt to hide the gun.

When Blair, Jr. went to repossess the truck, Blair, Sr. knew that: (i) his son was looking for the truck; (ii) Patterson would not voluntarily relinquish the truck; and (iii) Patterson had threatened other Courtesy employees during a failed attempt to repossess the truck. Blair, Sr. testified that Courtesy did not ordinarily finance vehicle loans, but he also testified that Courtesy sometimes had to repossess vehicles, noting only that it was a "rare occurrence." In fact, Blair, Jr. testified that another long-time employee, Mr. Dee, had handled repossessions for Courtesy up until the time of his death in June 1995, just a few months before the incident in this

case.[4] Thus, the record demonstrates that a reasonable juror could have concluded that Courtesy had previously repossessed cars. Furthermore, Blair, Sr.'s wealth of experience in the automobile business certainly made him aware of what can occur during automobile repossession.

Clearly, in confronting Patterson and shooting out the truck's tires, Blair, Jr. was acting to further the business interests of Courtesy. At the very least, his conduct was at least incidental to the conduct that was authorized by Courtesy. Here, just as in *Frederick*, Blair, Jr. was acting to protect his employer's property. In fact, Blair, Jr.'s testimony explicitly confirmed this motive. And perhaps most importantly, there is no evidence that he sought to serve any personal purpose by his actions. Quite simply, he engaged in the act to further his employer's business interests. This is clearly distinguishable from the acts of the employees in *Wood* and *Osborne*. And finally, although the act was criminal, it was not so outrageous to indicate that the motive was a personal one. Therefore, the jury's finding that Blair, Jr. acted within the scope of employment, thereby imposing vicarious liability on Courtesy, is supported by the evidence and the law of this Commonwealth.

## IV. CONCLUSION

The decision of the Court of Appeals on the issue of vicarious liability is reversed, and the case remanded for proceedings consistent with this opinion.

All concur.

GRAVES, J., not sitting.

---

**4.** Blair, Sr. did testify that, since the death of Mr. Dee, on the rare occasions when Courtesy needs to repossess vehicles, it uses an independent contractor.