RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0293p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOHN DOES 1–10,

  *Plaintiffs-Appellants*,

v.

DEBRA HAALAND; ELIZABETH WARREN,

  *Defendants-Appellees*.

No. 19-6347

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:19-cv-00117—William O. Bertelsman, District Judge.

Argued:  June 11, 2020

Decided and Filed:  September 3, 2020

Before:  CLAY, WHITE, and READLER, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Robert E. Barnes, BARNES LAW, LLP, Los Angeles, California, for Appelllants. Brooks M. Hanner, OFFICE OF GENERAL COUNSEL UNITED STATES HOUSE OF REPRESENTATIVES, Washington, D.C., for Appellee Haaland.  Uzoma N. Nkwonta, PERKINS COIE LLP, Washington, D.C., for Appellee Warren.  **ON BRIEF:**  Robert E. Barnes, Derek A. Jordan, BARNES LAW, LLP, Los Angeles, California, for Appelllants.  Brooks M. Hanner, Douglas N. Letter, Todd B. Tatelman, Sarah Clouse, OFFICE OF GENERAL COUNSEL UNITED STATES HOUSE OF REPRESENTATIVES, Washington, D.C., for Appellee Haaland.  Uzoma N. Nkwonta, Marc E. Elias, Christina A. Ford, PERKINS COIE LLP, Washington, D.C., Daniel J. Canon, Indianapolis, Indiana, for Appellee Warren.

—————————————

**OPINION**

—————————————

CLAY, Circuit Judge. Plaintiffs, ten unidentified minors, appeal the district court's order dismissing two Defendants, Senator Elizabeth Warren and Representative Debra Haaland, from this defamation suit. Plaintiffs claim that Senator Warren and Representative Haaland committed libel against them by issuing a series of tweets in response to a widely publicized incident on the National Mall in which Plaintiffs were involved. The district court found that Plaintiffs' defamation claims were barred by sovereign immunity. For the reasons provided in this opinion, we **AFFIRM** the district court's order.

**BACKGROUND**

Plaintiffs are ten unnamed minors who, at the time of the events in question, attended Covington Catholic High School, a private school in Park Hills, Kentucky. According to Plaintiffs' complaint, on January 18, 2019, Plaintiffs joined a larger group of classmates on a trip to Washington, D.C. to attend the anti-abortion March for Life. After attending the demonstration, Plaintiffs gathered near the Lincoln Memorial to await buses to return to Kentucky. While there, members of the religious sect known as the Black Hebrew Israelites allegedly taunted the students with profane insults. Some of the students purportedly sought permission from chaperones to recite school cheers to drown out the taunts.

After this interaction, Native American activist Nathan Phillips approached Plaintiffs. Phillips had participated in the Indigenous People's March—a political rally near the Lincoln Memorial—earlier in the day. According to Plaintiffs, Phillips "joined the students as they engaged in school cheers." R. 34-3, First Am. Compl., PageID # 429. These cheers included renditions of the Haka—a traditional Maori dance—and the "sports chant of the Florida State Seminoles and the Atlanta Braves, with their famous tomahawk chop." *Id.* at PageID # 429–30. Plaintiffs claim that in doing so they "joined with Phillips"—who was beating a drum and chanting a traditional Native American song. *Id.* at PageID # 429.

A video of Plaintiffs' interaction with Phillips was posted online and it swiftly spread. It depicts Phillips beating his drum and chanting while backed by a small number of Native American activists who are in turn surrounded by a larger circle of Covington students (identifiable by their Covington apparel), some of whom are also wearing clothing and hats displaying President Trump's "Make America Great Again" campaign slogan. A number of students are performing the "tomahawk" chop and one student is standing close to Phillips and staring at him.

Several politicians, journalists, and others with large social media followings shared versions of the video as well as articles that discussed it, many with commentary disapproving of Plaintiffs' actions. Numerous other individuals and media outlets also publicized the video. Plaintiffs complained of severe online harassment in response to the video's dissemination, including calls for their physical harm, expulsion, and for the public disclosure of their identities.

The public statements regarding the video that are relevant on appeal are those sent by Representative Debra Haaland and Senator Elizabeth Warren. On January 19, 2019, Representative Haaland sent a tweet from her official Congressional Twitter account that read: "This Veteran [Nathan Phillips] put his life on the line for our country. The students' display of blatant hate, disrespect, and intolerance is a signal of how common decency has decayed under this administration. Heartbreaking." *Id.* at PageID # 465. She later sent a tweet from her campaign Twitter account that linked to a Huffington Post article about the incident that included a video interview with Phillips following his interaction with the students, in which he stated that they were chanting "build that wall." *Id.* at PageID # 471. Her tweet stated: "A Native American Vietnam War veteran was seen being harassed and mocked by a group of MAGA hat-wearing teens." *Id.* Elected in 2018, Representative Haaland was one of the first Native American women elected to Congress. According to public reports, she attended the Indigenous People's March earlier in the day on January 18.

On January 19, Senator Elizabeth Warren sent a tweet from her official Senate Twitter account that stated "Omaha elder and Vietnam War veteran Nathan Phillips endured hateful taunts with dignity and strength, then urged us all to do better. Listen to his words." *Id.* at PageID # 473. This was followed by a link to a Splinter News article about the incident. The

article shared by Senator Warren also included a version of the video interview with Phillips in which he stated that he heard chants of "[b]uild that wall" from the crowd of Covington students. Sen. Warren's Br. at 9 (citing @splinter_news, Twitter (Jan. 19, 2019, 6:18 PM), https://twitter.com/splinter_news/status/1086764784706560001?lang=en).

On August 1, 2019, eight of the unnamed Plaintiffs filed suit in Kentucky court against Defendants, twelve individuals who sent tweets regarding the incident and Plaintiffs' participation therein. On August 14, 2019, Plaintiffs filed an amended complaint to add two more unnamed students as Plaintiffs. Each Defendant was accused of defamation, intrusion upon seclusion, and negligent infliction of emotional distress; while one (Kathy Griffin) was further accused of harassment via her online messages. Plaintiffs alleged that each Defendant made their statements:

> [K]nowing they both omitted true facts and implied false facts, including the false factual claim the Covington Boys interrupted an indigenous people's march, stopped, blocked and surrounded a native American elder war veteran for the purposes of taunting, harassing, and mocking him with chants of build the wall, aggregating these lies into public denunciations, calls for public doxing, and public demands of school expulsion, to induce public contempt upon the plaintiffs.

R. 34-3, First Am. Compl., PageID # 439. Plaintiffs asked for damages "in an amount not less than $15,000 but not more than $50,000" per Defendant. *Id.* at PageID # 463.

On August 28, 2019, Senator Warren removed the case to federal district court, citing the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1), as the basis for removal. Then on September 4, 2019, Senator Warren filed a motion to dismiss for lack of jurisdiction and for failure to state a claim on which relief could be granted. Representative Haaland subsequently filed her own motion to dismiss. On September 26, 2019, Plaintiffs filed a motion to remand to state court.

The district court issued an opinion and order in which it found that removal was proper under the Federal Officer Removal Statute, denied Plaintiffs' motion to remand, and granted Senator Warren's and Representative Haaland's motions to dismiss. It concluded that regardless of whether one agrees with Warren's and Haaland's communications, they were "intended to

convey the politicians' views on matters of public interest to their constituents." R. 80, Dist. Ct. Order, PageID # 1081. Therefore, "the statements were made within the scope of defendants' employment as elected representatives" and they were entitled to the benefit of sovereign immunity pursuant to 28 U.S.C. § 2679(b)(1). *Id.* This meant that the United States was substituted as Defendant in their place. However, because the United States has not waived its immunity to libel and slander suits, *id.* § 2680(h), the defamation claim could not proceed against the United States either. With no federal defendants left before it, the court lacked subject matter jurisdiction over the action. It then declined to exercise supplemental jurisdiction over Plaintiffs' state law claims against the remaining Defendants because those claims involved "unique issues of state law." *Id.* at PageID # 1082 (citing 28 U.S.C. § 1367(c)). It thus remanded the remaining claims to state court. This timely appeal followed.[1]

## DISCUSSION

We review a district court's order dismissing an action for lack of subject matter jurisdiction *de novo*. *See, e.g.*, *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 837 (6th Cir. 1999).

## I. Sovereign Immunity

Plaintiffs mistakenly frame Defendants' claim for immunity from libel suits as one premised on the Speech and Debate Clause, which states "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. This clause provides Congressmembers a limited form of legislative immunity from suit. *See Gravel v. United States*, 408 U.S. 606, 616 (1972) ("It . . . protects Members against prosecutions that directly impinge upon or threaten the legislative process."). However, the clause only protects speech made in the context of "legislative activities" and the "legislative process." *See, e.g.*, *Hutchinson v. Proxmire*, 443 U.S. 111, 127 (1979) (holding that the Speech

---

[1]On appeal, Plaintiffs do not challenge the district court's dismissal of their intrusion upon seclusion and negligent infliction of emotional distress claims against Defendants. Plaintiffs also fail to argue that the district court erred in denying their motion to remand. Consequently, those claims have been forfeited on appeal. *See, e.g.*, *Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996) (holding that issues not raised in an appellant's opening brief will not be considered on appeal).

and Debate Clause's protection "does not extend beyond what is necessary to preserve the integrity of the legislative process" (quoting *United States v. Brewster*, 408 U.S. 501, 517 (1972))). This provides meaningful limits on an otherwise broad grant of immunity.

In the present case, Plaintiffs contend that "[r]esponding to questions about their job [as Congressmembers] has been the only category of claims found immune from tortious libels outside of legislative duties or the legislative chamber," and so Defendants' tweets are not protected by the Speech and Debate Clause. Appellants' Br. at 15. Whatever the merits of Plaintiffs' argument, neither Senator Warren nor Representative Haaland have cited the Speech and Debate Clause—in either their motions to dismiss below or in their filings before this Court—to demonstrate the lack of federal subject matter jurisdiction over this action. Consequently, Plaintiffs' arguments on this point are irrelevant to the issue presented in this case.

Instead, Defendants rely on the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.*, as amended by the Westfall Act, 28 U.S.C. § 2679(b)(1), to undergird their immunity claim. "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted). The FTCA waives the United States' sovereign immunity for certain torts committed by federal employees while acting in the scope of their employment. 28 U.S.C. §§ 1346, 2671 *et seq.* In general, the FTCA provides federal district courts exclusive jurisdiction over claims against the United States for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" by federal employees acting within the scope of their employment. *Id.* § 1346(b)(1). It does not, however, waive sovereign immunity for claims "arising out of . . . libel [and] slander." *Id.* § 2680(h).

Prior to 1988 litigants could sue federal tortfeasors in their individual capacity, subject to specific exceptions created by Congress to protect certain classes of employees from personal liability. *See United States v. Smith*, 499 U.S. 160, 170 & n.11 (1991). In 1988, Congress abandoned this piecemeal approach and passed broad legislation to extend the benefit of sovereign immunity to all federal employees. This law, the Federal Employees Liability Reform and Tort Compensation Act (i.e., the Westfall Act), amended the FTCA to provide that "[t]he

remedy against the United States provided [in the FTCA] . . . is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter *against the employee whose act or omission gave rise to the claim* or against the estate of such employee." 28 U.S.C. § 2679(b)(1) (emphasis added); *see also Levin v. United States*, 568 U.S. 503, 509 (2013) (holding that the Westfall Act "makes the remedy against the United States under the FTCA exclusive for torts committed by federal employees acting within the scope of their employment").

"Under the Act, the United States shall be substituted for the employee as a defendant in any common law tort action initiated against an employee if the employee was acting within the scope of employment." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1147 (6th Cir. 1994). Moreover, as interpreted by the Supreme Court, the Westfall Act immunizes individual federal employees even where the FTCA bars a suit against the United States as well. *Smith*, 499 U.S. at 166; *see also Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) ("If . . . an exception to the FTCA shields the United States from suit, the plaintiff may be left without a tort action against any party.").

## A. Applicability of the Westfall Act to Members of Congress

To prevail, Defendants must demonstrate that members of Congress are protected by the Westfall Act. They must first show that Congressmembers are "employee[s] of the Government." 28 U.S.C. § 2679(b)(1). Plaintiffs contend that "there is zero evidence the Westfall Act was about Congressmembers at all." Appellants' Reply Br. at 6–7.

Although we have not yet considered this issue, the First Circuit has squarely held that members of Congress are government employees for purposes of the FTCA. *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 70–71 (1st Cir. 1998). The Fifth Circuit has reached the same conclusion. *See Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) ("A Member of Congress who holds an office in the U.S. House of Representatives is clearly an employee or officer of the legislative branch of the federal government."). We agree with our sister circuits.

The plain text of the FTCA, as amended by the Westfall Act, compels this interpretation. The statute provides that "'[e]mployee of the government' includes . . . officers or employees of

any federal agency."  28 U.S.C. § 2671.  "[T]he term 'Federal agency' includes the executive departments, the judicial and legislative branches," and other governmental entities.  *Id.*  And the Supreme Court held in *Lamar v. United States*, 241 U.S. 103, 111–12 (1916), that a Representative is "an officer acting under the authority of the United States" for purposes of a criminal statute that punishes individuals who "falsely assume or pretend to be an officer or employee acting under the authority of the United States."  This was based on several factors, including common dictionary definitions of the term "officer," historical evidence that Representatives have been consistently considered "legislative officers" or "civil officer[s]," and prior state and federal precedent indicating as much.  *Id.* at 113; *see also, e.g.*, *The Ku Klux Cases*, 110 U.S. 651, 664 (1884) ("[T]he constitution . . . created the office of member of congress.").  We see no reason why the term "officers" in the Westfall Act should be construed more narrowly than the same term in the statute at issue in *Lamar*, especially because the Westfall Act specifically expands sovereign immunity to the entire legislative branch.

Moreover, while contemporary legislative history from the passage of the Westfall Act does not directly address this question, as the First Circuit queried "[w]hy would Congressmen vote to exclude themselves from a universal grant of immunity given to all others; to all employees below them; to all officers, up to the president, above them?"  *Operation Rescue Nat'l*, 147 F.3d at 70–71; *see also id.* at 71 ("If the *Westfall* Act clearly and carefully intended to exclude Congressmen from the FTCA's otherwise universal benefits, would there not have been, at the least, some Congressmen who would have remonstrated?"); *Williams*, 71 F.3d at 505 ("If Congress intended to exclude Members of Congress from the protection of the FTCA, it could have expressly done so within the language of the Act.").  We agree that it is highly unlikely that Congress would exclude itself, *sub silentio*, from such a broad grant of immunity. This conclusion, coupled with the unambiguous text of the statute, makes clear that members of Congress—Representatives and Senators alike—enjoy the benefits of the FTCA as amended by the Westfall Act.

## B.  Scope of Employment

We turn now to the central question presented by this appeal: whether Senator Warren and Representative Haaland were acting within the "scope of [their] office or employment" when

they sent the allegedly defamatory tweets. 28 U.S.C. § 2679(b)(1).  If they were, then they are entitled to the protections of the Westfall Act.[2]

For purposes of the Westfall Act, "whether the federal employee was acting within the scope of his or her employment, is governed by the agency law of the forum state." *Dolan v. United States*, 514 F.3d 587, 593 (6th Cir. 2008); *see also Henson*, 14 F.3d at 1147 ("A determination of whether an employee was acting within the scope of employment is a question of law, not fact, made in accordance with the law of the state where the conduct occurred.")

In the present case, the forum state is Kentucky and the conduct—i.e., the allegedly defamatory tweets—occurred in Kentucky because Plaintiffs live in Kentucky and the tweets were accessible in that state.  *See Williams*, 71 F.3d at 506 (finding Texas law governed scope-of-employment inquiry even though allegedly defamatory interview occurred in Washington, D.C., because plaintiff was domiciled in Texas and because the interview broadcast occurred in Texas, "[t]hus, the alleged defamation . . . and any resulting harm essentially took place in the State of Texas"); *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011) (observing that "in a sense, the internet operates 'in' every state regardless of where the user is physically located").  We therefore apply Kentucky law to determine whether Defendants were acting within the scope of their employment.[3]   Additionally, Plaintiffs only contend that Kentucky law applies.

---

[2]Plaintiffs emphasize that neither Senator Warren nor Representative Haaland have received certification from the Attorney General ("AG") that their conduct was within the scope of their employment.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) (observing that the Westfall Act "empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment at the time of the incident out of which the claim arose'" and that "[u]pon certification, the employee is dismissed from the action and the United States is substituted as defendant" (quoting 28 U.S.C. § 2679(d)(1))).

It does not appear from the record that either Defendant sought AG certification prior to filing their motion to dismiss under the Westfall Act.  Regardless, Plaintiffs do not suggest that this failure to seek AG certification precludes Defendants from prevailing on their theory of sovereign immunity.  Instead, all Plaintiffs request is that we not defer to the district court's independent finding that Defendants were within the scope of their employment. *See* 28 U.S.C. § 2679(d)(3) (empowering district courts to "to find and certify that the employee was acting within the scope of his office or employment" upon motion of the employee).  But Plaintiffs are already receiving the most favorable standard of review they can ask for on appeal because our review of the district court's order to dismiss for lack of subject matter jurisdiction is *de novo*.

[3]This conclusion of course has no bearing on whether Defendants have sufficient contacts with Kentucky to confer personal jurisdiction on the court.  In the context of electronic communications that inquiry examines factors beyond where, strictly speaking, the communication is accessible.  *See Shrader*, 633 F.3d at 1240 ("[I]t is

If Plaintiffs cannot demonstrate that Defendants' conduct was outside their scope of employment as understood by Kentucky law, then Plaintiffs cannot prevail in this appeal.

Kentucky law focuses on an employee's motive to determine whether she was acting within the scope of her employment when committing intentional torts, including libel. The Kentucky Supreme Court has held that an employee acts within the scope of his employment when his "purpose, however misguided, is wholly or in part to further the master's business." *Patterson v. Blair*, 172 S.W.3d 361, 369 (Ky. 2005) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 500, 505 (5th ed. 1984)). In *Patterson v. Blair*, the court concluded that an employee who shot the tires on the plaintiff's truck while attempting to repossess it for his employer was acting within the scope of his employment. *Id.* at 372 ("Clearly, in confronting [plaintiff] and shooting out the truck's tires, [the employee] was acting to further the business interests of [his employer]. At the very least, his conduct was at least incidental to the conduct that was authorized by [the employer]."); *see also Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000) ("[T]o be within the scope of its employment, the conduct must be of the same general nature as that authorized or incidental to the conduct authorized."). In *Osborne v. Payne*, the Kentucky Supreme Court found that a priest who engaged in adultery with a married woman whom he was counseling was not acting within the scope of his employment. 31 S.W.3d at 915. This "abuse by the priest of his position . . . exceeds the scope of his employment" because it was "beyond question that Osborne was not advancing any cause of the diocese or engaging in behavior appropriate to the normal scope of his employment." *Id.*

Neither Kentucky courts nor this Court have decided whether statements such as those at issue—unsolicited comments by elected officials on an event of widespread public interest—are within the "scope of employment" of members of Congress. However, out-of-circuit precedent involving situations closely aligned to the facts of this case strongly supports finding that these tweets were within the scope of Defendants' employment as officers of the United States.

---

necessary to adapt the analysis of personal jurisdiction to this unique circumstance [of electronic communications] by placing emphasis on the internet user or site *intentionally directing* his/her/its activity or operation *at* the forum state rather than just having the activity or operation accessible there."). We do not reach the question of personal jurisdiction in this case, however, because "expedition and sensitivity to state courts' coequal stature should impel the federal court to dispose of [subject matter jurisdiction] first." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587–88 (1999).

In *Operation Rescue National v. United States*, the First Circuit found that Senator Ted Kennedy was protected by the Westfall Act when, in the course of responding to a reporter's question pertaining to a bill he was sponsoring that addressed access to women's health clinics, he said that anti-abortion organizations like the plaintiff had a "national policy [of] firebombing and even murder." 147 F.3d at 69 (alteration in original). Although the plaintiff did not appeal the district court's finding that Senator Kennedy was acting within the scope of his employment when he made the remarks, the First Circuit affirmed the district court's reasoning "[i]n all respects." *Id.* at 71. The district court applied Massachusetts law, as the comments were made in Senator Kennedy's home state. *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 106 (D. Mass. 1997). Similar to Kentucky, Massachusetts law looks to see if the employee was authorized to engage in the conduct complained of and whether she was acting in the interests of her employer to determine whether the employee was acting in the scope of her employment. *Id*. The district court found, in relevant part, that because "Senator Kennedy was providing political leadership and a basis for voters to judge his performance in office—two activities that public officials are expected, and should be encouraged, to perform," his comments were within the scope of employment. *Id.* at 108. In this sense, the Senator's employer was his constituents and he served them by fully informing them of his views and working to pass legislation he believed would benefit them.

Moreover, in *Williams v. United States*, the Fifth Circuit determined whether Congressman Jack Brooks' allegedly defamatory statements about a lobbyist and his firm were within the scope of his employment under Texas' vicarious liability regime, which, like Kentucky's, focuses on whether the employee was authorized to perform the action complained of and whether it furthered her employer's interests. 71 F.3d at 506. Congressman Brooks made the statements in a press interview about Congress' appropriation of certain federal monies, including funding for the restoration of a battleship in Texas which the lobbyist had advocated for. *Id.* at 504 & n.1. The court held that the statements were made in the scope of Congressman Brooks' employment because "a primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents." *Id.* at 507. His statements, including the allegedly defamatory ones, were made in performance of his duty to "inform[] constituents and the public at large of issues being considered by Congress." *Id.* Consequently,

the court held that the Westfall Act granted Congressman Brooks immunity from the lobbyist's defamation suit. *Id.*

Additionally, in *Council on American Islamic Relations v. Ballenger*, the D.C. Circuit found that a Congressman's comments to the press on his pending separation from his wife were within the scope of his employment because "[a] Member's ability to do his job as a legislator effectively is tied, as in this case, to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." 444 F.3d 659, 665 (D.C. Cir. 2006). By commenting on his private life, the Congressman was seeking to maintain his constituents' trust in him and thereby discharge his legislative responsibilities more effectively. *Id.* at 665–66.

In the present case, the articles shared by Senator Warren and Representative Haaland discussed an interview in which Nathan Phillips recollected hearing chants of "[b]uild that wall" emanating from the crowd of students. This reasonably relates the political subtext of the incident to President Trump's well-known campaign promise to build a border wall with Mexico. As Senator Warren observes, the border wall was at the time of the incident—January 2019—the "subject of extensive debate" in Congress, surrounding both the partial government shutdown and pending legislation. Sen. Warren's Br. at 23 (citing Fund and Complete the Border Wall Act, H.R. 85, 116th Cong. (introduced Jan. 3, 2019); Border Wall Trust Fund Act, H.R. 200, 116th Cong. (introduced Jan. 3, 2019)).

This context aligns their tweets with Senator Kennedy's comments in *Operation Rescue* and Congressman Brooks' statements in *Williams*: each comment constituted a condemnation of a political adversary's public acts. Senator Warren and Representative Haaland were criticizing supporters of President Trump, in part, for their alleged deployment of a topical and polarizing political issue (i.e., the border wall) in their purported harassment of Phillips. Senator Kennedy was criticizing an organization at odds with the goals of his bill and Congressman Brooks was criticizing a lobbyist in connection with Congressional appropriations. In each case, the allegedly defamatory statements were made in the context of informing constituents of the Congressmembers' views and as part of their advocacy—whether for or against—current legislation. If anything, Senator Kennedy's allegations of domestic terrorism and murder were closer to the outer bounds of his scope of employment than Senator Warren's and Representative

Haaland's less inflammatory tweets.  Defendants were reasonably connecting Plaintiffs' rhetoric and clothing to President Trump in order to comment on an event that had received widespread press attention and that resonated with the pressing issue of funding for the border wall.

Plaintiffs respond that the *Operation Rescue National*, *Williams*, and *Ballenger* cases hinged on the statements at issue being "in response to press inquiries, and notably not 'made gratuitously' to serve personal political interests."  *See* Appellants' Br. at 28 (citing *Operation Rescue Nat'l*, 975 F. Supp. at 108).  However, it is the act of communicating one's views to constituents and not the manner of communication that justifies application of the Westfall Act. That is, Defendants' statements are protected whether they are freestanding or made in response to a press inquiry.  Indeed, Plaintiffs cannot point to language in the case law that suggests speech is only within the scope of a Congressmember's employment when that speech is in response to an interview question.  Instead, the statements at issue in *Operation Rescue National*, *Williams*, and *Ballenger* were protected because the media interviews facilitated the kind of communication with constituents and the general public that the courts held to be within the scope of employment.

Far from being gratuitous, these tweets fit within the "wide range of legitimate 'errands' performed for constituents," which includes "preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress."  *Brewster*, 408 U.S. at 512.**[4]** Senator Warren and Representative Haaland sought to oppose the President and his legislative goals by putting on record their opposition to Plaintiffs' actions.  Although the foregoing cases examining whether similar statements were protected by the Westfall Act largely preceded the advent of Twitter, social media websites are the "modern public square," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).  There is no meaningful difference between tweets and the other kinds of public communications between an elected official and their constituents that have been held to be within the scope-of-employment under the Westfall Act.

---

**[4]**Although the Supreme Court held that these "errands" are not protected by the Speech and Debate Clause because "they are political in nature rather than legislative," *Brewster*, 408 U.S. at 512, the Westfall Act protects more conduct than the Speech and Debate Clause.  Cases like *Williams* and *Ballenger* illustrate that the Westfall Act extends to these sorts of "political" activities because they are integral to a Congressmember's duties to communicate with their constituents and publicly discuss political matters.

With this understanding of the scope of a Congressmember's employment and how tweets can fit into her duties, we return to Kentucky law. Applying that law, it is clear that the tweets were made in furtherance of the interests of Defendants' employers. *See Patterson*, 172 S.W.3d at 369. They were calculated to serve the interests of Defendants' constituents (i.e., employers) by informing them of Defendants' views regarding a topical issue and related legislation. This was accomplished through considerably more appropriate and commonplace means—messages sent via Twitter—than the attempted repossession via handgun in *Patterson*. Yet the *Patterson* court still found that firing a gun at a delinquent purchaser's car was within the scope of his employment because the violent conduct was at least incidental to his authorized work. *Id.* at 372. The nexus between Defendants' tweets and their constituents' interests in understanding their views is considerably greater than that.

Moreover, unlike the priest in *Osborne*, Plaintiffs were "engaging in behavior appropriate to the normal scope of [their] employment." 31 S.W.3d at 915. Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings. Defendants' statements were made within the scope of their employment. Therefore, the United States was properly substituted as Defendant in this case and the district court correctly dismissed Senator Warren and Representative Haaland from the suit. That the United States has not waived its immunity to libel suits is of no moment. *See Gutierrez de Martinez*, 515 U.S. at 420 ("If . . . an exception to the FTCA shields the United States from suit, the plaintiff may be left without a tort action against any party."). Plaintiffs may wish to pursue their claims for relief against the remaining Defendants in state court.

**CONCLUSION**

For the reasons provided above, we **AFFIRM** the district court's order.