RENDERED: FEBRUARY 28, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1471-MR

SHERI JERVIS (FKA SHERI CONN),　　　　　　　　　APPELLANT
AS ADMINISTRATRIX OF THE
ESTATE OF GEORGE TYRELL
BURCHETT, AND NEXT
FRIEND/GUARDIAN OF WYATT
ROBBIE BURCHETT


　　　　　　　　　　APPEAL FROM WEBSTER CIRCUIT COURT
v.　　　　　　　　　HONORABLE DANIEL M. HEADY, JUDGE
　　　　　　　　　　ACTION NO. 19-CI-00073


WEBSTER COUNTY COAL, LLC　　　　　　　　　　APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; A. JONES AND LAMBERT,
JUDGES.

JONES, A., JUDGE: The Appellant, Sheri Jervis, as administratrix of the Estate of

George Tyrell Burchett and next friend/guardian of Wyatt Robbie Burchett

(collectively, "the Estate"), filed wrongful death and loss of consortium claims

against the Appellee, Webster County Coal, LLC ("WCC"). The Estate alleged

that WCC should be held liable for the death of George Burchett, one of its employees, at the hands of another employee, Christopher Johnston.

The Webster Circuit Court granted summary judgment in favor of WCC, reasoning that all the Estate's claims were time-barred by a contractual limitations period in Burchett's agreement with WCC. Alternatively, the court found no genuine issues of material fact.

While we disagree with the trial court's conclusion that the wrongful death and loss of consortium claims are time-barred, we affirm its alternative finding that WCC is entitled to summary judgment because no issues of material fact exist that would make WCC liable for Burchett's death. Accordingly, having reviewed the record and being otherwise sufficiently advised, we affirm.

## I. BACKGROUND

During the relevant time period, WCC operated an underground coal mine in Dixon, Kentucky, where Burchett and Johnston were both employed as roof bolters. Before hiring the men, WCC conducted background checks, fitness for duty examinations, and drug and alcohol screens.[1] The results revealed no propensity for violence and no reason to believe either man was unfit for the position of roof bolter.

---

[1] WCC hired Burchett in January 2018; it hired Johnston in April 2018.

During the course of his employment, Johnston did not commit any disciplinary infractions. While Burchett was disciplined for attendance issues, he did not commit any serious infractions. Their supervisor, Ryan Hammers ("Supervisor Hammers"), testified that Burchett and Johnston were friendly before the incident in question. Although Burchett was known to have a temper,[2] neither man exhibited violent tendencies at work.

In the days leading up to July 2, 2018, Burchett and Johnston became embroiled in a personal dispute involving Burchett's ex-girlfriend and the mother of his young son, Mika Ramey. About a week before the incident, Johnston and Ramey began messaging one another. At one point, Johnston told Ramey that Burchett had been showing nude photographs of her to other coal miners. When Burchett learned of this, he became angry.

Around midday on July 2, 2018, Burchett began messaging Johnston on Facebook Messenger. Although Johnston could not recall the exact wording, he testified that Burchett was upset, and that he may have threatened physical violence. Johnston responded with something to the effect of "just leave me alone and drop it," and he then blocked Burchett from contacting him further on Facebook.

---

[2] During his deposition, Supervisor Hammers explained that, while he had never seen Burchett get into any kind of a physical altercation, he was known to "vent and rant" from time to time.

Johnston denied agreeing to meet Burchett at WCC later that evening. However, before Johnston left for work that night, Ramey contacted him and warned him to "watch out for Burchett because he might do something." Johnston testified that he was unsure whether Burchett planned to confront him that evening, the following week when they were both scheduled to work, or whether he might show up at Johnston's home. Regardless, Johnston did not tell anyone at WCC about Burchett's threatening messages.

That evening, on July 2, 2018, Johnston was scheduled to work the third shift, which began around 10:00 p.m. Burchett was not scheduled to work that night. When Supervisor Hammers arrived at WCC around 9:00 p.m., he noticed a car parked inside the premises near the entrance. Shortly thereafter, Burchett called Supervisor Hammers and identified himself as the driver of the car near the entrance. Burchett then proceeded to tell Supervisor Hammers that:

> [Burchett] was waiting on [Johnston], and [Burchett] said about [Johnston] telling his little boy's mom [Ramey] what [Burchett] had been doing and [Burchett] was – and they had been messaging each other back and forth all day, and [Burchett] was going to meet [Johnston] out there and go down the road and [Burchett] was going to smack the "F" out of [Johnston].

(Record ("R.") at 748.)

According to Supervisor Hammers, the phone call was brief, and he did not counsel Burchett regarding his intentions. Supervisor Hammers testified

-4-

that while Burchett sounded upset, he did not seem intoxicated. It is undisputed that Supervisor Hammers did not inform his supervisor or law enforcement that Burchett was in the parking lot.

Johnston described what happened when arrived he at WCC shortly before his shift as follows:

> I pulled into the parking lot. [Burchett] said – he said a few words. I can't remember all the words. I just know he said, "Follow me down here to this four-way stop." I did. He got out; I exited the vehicle; once we had stopped; once we had stopped, there was a couple of words; and then he – and then he struck me – he hit me in the head – and then pinned me down on top of my car; and then that is where I began to stab him; and then it – and then it ended; and then, realizing I had hurt [Burchett] badly, I got in my car, went down to the coal mine to find a medical person, upon which I talked to [Supervisor Hammers] – I'm sure you know all the details anyway – but I talked to [Supervisor Hammers]; told him that I had hurt [Burchett]; I needed somebody medically trained to come down there; somebody did – I think it was Keith Gipson – and then the two others followed, just to be able to help, or whatever reason they wanted to and – and then we all got down there, and that was about it.

(R. at 646.) According to Johnston, he did not bring the knife with him that evening intending to use it against Burchett. Instead, he testified that the knife – a standard-size pocketknife – was one he regularly kept in his car. Before exiting his vehicle, he picked it up in case he needed to defend himself.

Law enforcement officers were called to the scene, and Burchett was pronounced dead. Johnston was charged with murder but ultimately pleaded guilty to first-degree manslaughter.[3] He was sentenced to ten years in prison.

On May 6, 2019, the Estate filed suit against WCC and Johnston, alleging that Johnston was responsible for Burchett's death and that WCC was vicariously liable for his actions. The Estate further claimed that WCC was negligent, asserting that Supervisor Hammers had "instructed and ratified" Burchett's and Johnston's decision to leave WCC to engage in a physical altercation. Additionally, the Estate argued that WCC was liable for negligently hiring and retaining Johnston, contending that WCC knew or should have known that Johnston was likely to engage in an altercation that could result in harm to Burchett. The Estate was later permitted to amend its complaint to include a loss of consortium claim on behalf of Burchett's minor son.

After a period of discovery, WCC filed a motion for summary judgment. The Estate responded. After briefing and argument, the circuit court granted WCC's motion. Its order includes a CR[4] 54.02 certification.[5] This appeal followed.

---

[3] Kentucky Revised Statutes ("KRS") 507.030.

[4] Kentucky Rules of Civil Procedure.

[5] "[CR] 54.02 allows a trial court dealing with multiple claims or multiple parties in a single action to grant a final judgment as to fewer than all of the claims or parties upon a determination

-6-

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. The movant bears the initial burden of demonstrating that there is no genuine issue of material fact in dispute.

The party opposing the motion then has the burden to present, "at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest, Inc. v. Scansteel Serv. Ctr, Inc.*, 807 S.W.2d 476, 482 (Ky. 1991); *Watson v. Landmark Urology, P.S.C.*, 642 S.W.3d 660, 666 (Ky. 2022). "A party responding to a properly supported summary judgment motion cannot merely rest on the allegations in its pleadings." *Versailles Farm Home and Garden, LLC v. Haynes*, 647 S.W.3d 205, 209 (Ky. 2022) (citing *Continental Cas. Co. v. Belknap Hardware & Mfg. Co.*, 281 S.W.2d 914, 916 (Ky. 1955)). "[S]peculation and supposition are insufficient to justify a submission of a case to the jury, and that the question should be taken from the jury when the evidence is so

---

that there is no just reason for delay." *Watson v. Best Financial Services, Inc.*, 245 S.W.3d 722, 723 (Ky. 2008). A certification was necessary in this case because the Estate also sued Johnston. As those claims remained pending, certification was required to allow for an immediate appeal of the summary judgment ruling.

unsatisfactory as to require a resort to surmise and speculation." *O'Bryan v. Cave*, 202 S.W.3d 585, 588 (Ky. 2006) (quoting *Chesapeake & Ohio Ry. Co. v. Yates*, 239 S.W.2d 953, 955 (Ky. 1951)).

"An appellate court's role in reviewing a summary judgment is to determine whether the trial court erred in finding no genuine issue of material fact exist[ed] and the moving party was entitled to judgment as a matter of law." *Feltner v. PJ Operations, LLC*, 568 S.W.3d 1, 3 (Ky. App. 2018). The standard of review for an appellate court is *de novo* because only legal issues are involved. *Isaacs v. Sentinel Ins. Co. LTD.*, 607 S.W.3d 678, 681 (Ky. 2020).

## III. ANALYSIS

The trial court granted summary judgment to WCC on two alternative grounds: (1) the Estate's claims were time-barred by a contractual limitations period in Burchett's agreement with WCC, and (2) no genuine issues of material fact existed, entitling WCC to judgment as a matter of law. We address each ground below, providing additional facts where necessary.

### A. Contractual Limitations Period

It is undisputed that, as a condition of his employment with WCC, Burchett signed an agreement on January 15, 2018. The agreement limited the time to file any claims or lawsuits related to his employment with WCC to no more than six months from the date of the action giving rise to the claim or lawsuit. The

-8-

trial court found that all the Estate's claims were time-barred by this contractual period.

KRS 336.700(3)(c) provides:

Any employer may require an employee or person seeking employment to execute an agreement to reasonably reduce the period of limitations for filing a claim against the employer as a condition or precondition of employment, provided that the agreement does not apply to causes of action that arise under a state or federal law where an agreement to modify the limitations period is preempted or prohibited, and provided that such an agreement does not reduce the period of limitations by more than fifty percent (50%) of the time that is provided under the law that is applicable to the claim.

*Id.* Furthermore, KRS 336.700(8) provides that "[t]his section shall apply prospectively and retroactively." Under the plain language of the statute, "the provision in [Burchett's] employment application is not void as against public policy." *Croghan v. Norton Healthcare, Inc.*, 613 S.W.3d 37, 42 (Ky. App. 2020). Moreover, the agreement did not shorten the applicable statutes of limitations by more than fifty percent (50%) of the time provided under the law, as it is undisputed that the relevant statutes of limitations are one year. This is essentially where the trial court concluded its analysis. However, the issue is more nuanced than it initially appears.

Burchett could only bargain away rights that belonged to him. We do not dispute that some of the Estate's claims were personal to Burchett, including

those for his injuries, physical and mental pain and suffering, and medical expenses. Pursuant to KRS 411.140, claims for pain and suffering, or other claims that arise during a decedent's lifetime and survive his death, are for the benefit of the estate, and must be brought by the personal representative. As the Kentucky Supreme Court explained in *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 598 (Ky. 2012):

> This is the so-called survival statute, another extension of the common law, and under it a personal injury claim does not lapse upon the death of the injured person, as was the common-law rule, but may be 'brought or revived by the personal representative' on behalf of the decedent's estate.

In such cases, the personal representative merely stands in the shoes of the decedent. Accordingly, the personal representative is bound by any agreements the decedent entered into during his lifetime that affect the claim, including the contractual limitations provision Burchett signed with WCC.

> KRS 411.130(1) provides as follows:
>
> [w]henever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased.

Notably, "the wrongful death action begins where the personal injury action ends[.]" *Farmers Bank and Tr. Co. of Bardstown v. Rice*, 674 S.W.2d 510, 512

-10-

(Ky. 1984). A wrongful death claim is "a distinct interest in a property right that belongs only to the statutorily-designated beneficiaries." *Preferred Care Partners Mgmt. Grp., L.P. v. Alexander*, 530 S.W.3d 919, 921 (Ky. App. 2017). The claim is created by the decedent's death, but the claim never belonged to the decedent. *Moore v. Citizens Bank of Pikeville*, 420 S.W.2d 669, 672 (Ky. 1967). The wrongful death claim is not derived through or on behalf of the decedent but accrues separately to the wrongful death beneficiaries and is intended to compensate them for their own pecuniary loss. *Ping*, 376 S.W.3d at 599.

For this reason, the Kentucky Supreme Court has held that a decedent cannot bind his beneficiaries to arbitrate their wrongful death claim by any action he takes during his lifetime. *Id.* Only the beneficiaries have the right to contractually limit the wrongful death claim. *LP Louisville East, LLC v. Patton*, 651 S.W.3d 759, 773 (Ky. 2020), *as modified* (Apr. 29, 2021).

The logic of *Ping* extends to the contractual limitations provision Burchett signed with WCC. Just as a decedent cannot bind his wrongful death beneficiaries to arbitration through a pre-death agreement, he likewise cannot unilaterally waive or restrict their independent statutory right to bring a wrongful death claim. The wrongful death cause of action belongs exclusively to the beneficiaries, not to the decedent or his estate, and is intended to compensate them for their own losses, rather than those suffered by the decedent during his lifetime.

-11-

Because Burchett had no authority to bargain away the rights of his statutory beneficiaries, any contractual provision shortening the time frame to bring claims can only apply to those claims that belonged to him – such as his personal injury claims – and not to the independent wrongful death claim. To hold otherwise would improperly allow employers to circumvent Kentucky's wrongful death statute by contract, effectively stripping beneficiaries of a cause of action that the legislature has expressly conferred upon them.

The same logic applies to the minor's loss of consortium claim, as it flows directly from Burchett's death and never belonged to him. Like the wrongful death claim, a child's loss of consortium is a separate cause of action intended to compensate for the child's own loss, not any harm suffered by the decedent. *Giuliani v. Guiler*, 951 S.W.2d 318, 322 (Ky. 1997). Because Burchett had no authority to waive or limit claims that did not belong to him, the contractual limitations provision cannot bind his minor son's consortium claim.

In sum, we affirm the trial court's grant of summary judgment as it relates to the Estate's personal injury claims, as those claims belonged to Burchett and were subject to the contractual limitations provision. However, we do not agree with the trial court's conclusion that the wrongful death and loss of consortium claims were likewise time-barred, as those claims belong to the statutory beneficiaries and were not subject to Burchett's employment agreement.

-12-

Accordingly, we must analyze the trial court's alternative basis for granting summary judgment on the wrongful death and loss of consortium claims – whether genuine issues of material fact exist that preclude judgment as a matter of law.

### B. Vicarious Liability

The Estate sued WCC, Johnston's employer, under a vicarious liability/respondeat superior theory, arguing that WCC should be held vicariously liable for Johnston's actions in stabbing Burchett to death. Although the trial court did not conduct a separate analysis of vicarious liability claim, it did determine that it was undisputed that Burchett and Johnston were "engaged in personal business" when Burchett was killed.

The Kentucky Supreme Court in *Papa John's International, Inc. v. McCoy*, 244 S.W.3d 44 (Ky. 2008), reaffirmed that an employer can only be held vicariously liable under the doctrine of respondeat superior if the employee's tortious conduct occurred within the scope of his employment. The Court emphasized that an employer is not liable when the employee's actions arise from personal motives unrelated to the employer's business. In *McCoy*, a pizza delivery driver made allegedly false statements to the police that led to a customer's arrest. The Court held that this conduct was an independent act, not undertaken to further the employer's business, and thus did not impose liability on the employer.

-13-

Applying *McCoy*, this Court held in *Hensley v. Traxx Management Company*, 622 S.W.3d 652 (Ky. App. 2020), that a gas station could not be held liable when its clerk shot a fleeing robber, as the act was unrelated to his job duties and motivated by personal concerns for his safety. Likewise, in *Feltner v. PJ Operations*, *supra*, we held that a pizza delivery company was not liable when a delivery driver, after clocking out, struck and killed a pedestrian while driving home. We emphasized that the determinative factor was not whether the driver had used a required work vehicle, but whether he was acting in furtherance of the employer's business at the time of the accident.

The Estate cites *Dennert v. Dee*, 215 S.W.2d 575, 577 (Ky. 1948), and *Frederick v. Collins*, 378 S.W.2d 617 (Ky. 1964), to support its vicarious liability claim. In *Dennert*, the Court held the owners of a nightclub liable for an assault committed by a bartender, reasoning that the bartender was acting within the scope of his employment when he forcibly removed a patron, as maintaining order was part of his job duties. Similarly, in *Frederick*, the Court found an employer liable when a grocery store manager shot and killed a customer who had announced a holdup, concluding that protecting the store was within the scope of his employment.

These cases are distinguishable from the present case because, in both *Dennert* and *Frederick*, the employees' actions were directly tied to their job

-14-

responsibilities – maintaining order in a business or protecting an employer's property. Here, under the undisputed facts, Johnston was not acting in furtherance of WCC's business when he stabbed Burchett to death. The dispute between Johnston and Burchett was entirely personal, arising from Johnston's alleged romantic involvement with Burchett's ex-girlfriend and accusations regarding Burchett's conduct toward her. Their conflict had no connection to their work at WCC, their job duties as roof bolters, or any workplace-related matter. Moreover, the altercation occurred offsite before Johnston's shift began and when Burchett was not scheduled to work. There is no evidence that Johnston's actions were in any way intended to serve WCC's interests. Given these facts, Johnston's attack was a personal act wholly outside the scope of his employment, making vicarious liability inapplicable. Accordingly, we affirm summary judgment with respect to this claim.

### C. Negligent Retention & Hiring

The Estate argues that disputed issues of material fact exist regarding its negligent hiring and retention claim, citing evidence that Johnston had a prior criminal history. Specifically, the Estate points to Johnston's 2013 guilty plea to unlawful transaction with a minor in the third degree under KRS 530.070. However, the Estate concedes that in 2015 – three years before WCC hired Johnston – he was permitted to withdraw his plea, and the charge was dismissed.

Negligent hiring and retention claims "require that an employer use reasonable care in the selection or retention of its employees." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 732 (Ky. 2009). "To succeed on a negligent hiring and retention claim, the plaintiff must prove: (1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." *Ritchie v. Turner*, 559 S.W.3d 822, 842 (Ky. 2018).

We have examined the record to determine whether there is a genuine issue of material fact as to whether WCC knew, or reasonably should have known: (1) Johnston was unfit for the job for which he was employed, and (2) whether his placement or retention in that job created an unreasonable risk of harm to Burchett. Here, the Estate's contention that WCC negligently hired and retained Johnston fails to create a disputed issue of material fact. During his deposition, Johnston explained that his 2013 charge for unlawful transaction with a minor stemmed from a personal relationship – he was 19 years old at the time and had run away with his underage girlfriend. Crucially, in 2015, he was allowed to withdraw his plea, and the charge was dismissed, meaning that by the time WCC hired him in 2018, he had no criminal conviction. Given that the charge was unrelated to workplace violence or aggression and had been dismissed years before his

-16-

employment, there was no reasonable basis for WCC to have known that Johnston was unfit for his job or posed an unreasonable risk of harm. Accordingly, this evidence does not create a genuine issue of material fact as to whether WCC negligently hired or retained Johnston. Therefore, the issue of liability on those claims was properly disposed of via summary judgment.

### D. Negligent Supervision

The Estate argues that the trial court erred in granting summary judgment on its negligent supervision claim, asserting that WCC failed to take appropriate action despite having notice of the escalating personal conflict between Burchett and Johnston. The Estate contends that WCC, through its supervisor, Ryan Hammers, knew that Burchett was waiting for Johnston in the parking lot and was upset, yet failed to intervene, notify security or law enforcement, or otherwise prevent the confrontation. By allowing the situation to unfold unchecked, the Estate argues that WCC breached its duty to exercise reasonable care in supervising its employees and maintaining a safe work environment. Based on these assertions, the Estate maintains that there are genuine issues of material fact regarding whether WCC's inaction contributed to Burchett's death, making summary judgment inappropriate.

Kentucky law recognizes that an employer can be held liable for the negligent supervision of its employees. *McDonald's Corp. v. Ogborn*, 309 S.W.3d

274, 291 (Ky. App. 2009). To assert a claim of negligent supervision, the plaintiff must allege that "the defendant knew or had reason to know of the employee's harmful propensities; that the employee injured the plaintiff; and that the hiring, supervision, or retention of such an employee proximately caused the plaintiff's injuries." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005).

In *Johnson v. United Parcel Service, Inc.*, 326 S.W.3d 812 (Ky. App. 2010), this Court affirmed summary judgment in favor of the employer, holding that an employer does not have a general duty to protect others from an employee's violent acts unless a special relationship exists or the employer has specific knowledge of an imminent threat. The Court found that the employer had no duty to warn a future employer about the employee's prior aggressive behavior because no recognized legal duty required it to do so. Importantly, the Court emphasized that foreseeability alone is insufficient to impose liability without a corresponding duty.

Applying *Johnson* to this case, WCC similarly had no legal duty to supervise or intervene in a purely personal dispute between Johnston and Burchett, particularly when there was no history of workplace violence or threats between them. The altercation arose from a private matter unrelated to their employment, occurred offsite, and happened before Johnston's shift even began.

-18-

Furthermore, a critical distinction in this case is that Supervisor Hammers only knew that Burchett was upset and waiting in the parking lot – suggesting that Burchett, not Johnston, was the likely to be the aggressor. There is no evidence that Supervisor Hammers had any reason to believe that Johnston would respond with deadly force, nor is there any indication that he knew Johnston had a weapon. Under *Johnson*, an employer cannot be held liable for negligent supervision unless it had specific knowledge that an employee posed an unreasonable risk of harm. Without any reason to foresee Johnston's violent response, WCC had no duty to act. Because negligent supervision requires proof that an employer knew or should have known an employee posed a danger, the Estate cannot establish that WCC was negligent in supervising Johnston.

Moreover, a general commitment to workplace safety does not impose a duty to act when an employer has no reasonable basis to foresee deadly harm, especially in a case like this, where the conflict was personal and took place outside of working hours. Without clear evidence that WCC knew or should have known that Johnston posed an imminent threat, the Estate's reliance on the handbook[6] is insufficient to support a negligent supervision claim, and summary judgment was properly granted.

---

[6] We note here that WCC's employee handbook, relied upon by the Estate as supportive of its claims, merely references making "safety a top priority."

### *E. Loss of Consortium*

The loss of consortium claim is derivative and cannot stand independently of the underlying claims. In *Godbey v. University Hospital of Albert B. Chandler Medical Center, Inc.*, 975 S.W.2d 104, 106 (Ky. App. 1998), this Court reaffirmed that a loss of consortium claim fails if the plaintiff cannot establish causation for the injury giving rise to it, stating: "As far as the claim of Mrs. Godbey to damages for loss of consortium, if no causation is established for the injuries which she alleges caused her loss, no recovery can be had."

Here, because the trial court properly granted summary judgment on all of the Estate's underlying claims the loss of consortium claim necessarily fails. Without an actionable claim against WCC for Burchett's death, there is no legal basis to hold WCC liable for loss of consortium. Accordingly, the trial court correctly concluded that there could be no recovery on this claim.

### IV. CONCLUSION

For the reasons set forth above, we affirm the Webster Circuit Court's November 29, 2023, amended order granting summary judgment to WCC.

ALL CONCUR.

-20-

BRIEFS FOR APPELLANT:

John C. Whitfield
Madisonville, Kentucky

BRIEF FOR APPELLEE:

Melanie J. Kilpatrick
Lexington, Kentucky